UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 23-3152

_____

UNITED STATES OF AMERICA,                          Appellee,

v.

JONATHAN SHROYER,                                Appellant.

### APPELLEE'S MOTION TO DISMISS APPEAL, OR IN THE ALTERNATIVE, OPPOSITION TO APPELLANT'S EMERGENCY MOTION FOR RELEASE PENDING APPEAL

Pursuant to Fed. R. App. P. 27, appellee, the United States of America, by and through the United States Attorney for the District of Columbia, respectfully moves to dismiss the appeal of appellant Jonathan Shroyer in accordance with the plea agreement in this case. Should this Court allow Shroyer's appeal to proceed, the Court should deny the motion for release pending appeal because Shroyer cannot satisfy the requirements of 18 U.S.C. § 3143(b).

# INTRODUCTION

Shroyer seeks to appeal his within-Guidelines sentence of 60 days' incarceration, which was imposed after he pleaded guilty to one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). However, as part of his written plea agreement, Shroyer waived the challenge to his sentence that he now attempts to press on appeal. This Court should enforce the plea agreement and dismiss Shroyer's appeal.

Should the Court decline to dismiss the appeal, Shroyer's motion for release pending appeal should be denied on the merits. Shroyer claims that the district court violated the First Amendment when it considered Shroyer's speech in determining his sentence. However, a sentencing court may consider a defendant's statements if those statements are relevant to legitimate sentencing considerations. *See Dawson v. Delaware*, 503 U.S. 159, 165 (1992). Here, the district court properly considered Shroyer's statements during and after the charged offense in its analysis of the 18 U.S.C. § 3553(a) sentencing factors. Because the district court committed no error, Shroyer cannot establish that his appeal "raises a substantial question of law or fact" likely to result in

either "a sentence that does not include a term of imprisonment," or "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." *See* 18 U.S.C. § 3143(b)(1)(B); Fed. R. App. P. 9(c).

## BACKGROUND

### A.   Shroyer Participated in the January 6, 2021, Attack on the U.S. Capitol.

Jonathan Shroyer hosts an internet-streaming program for the company InfoWars (ECF 39, ¶ 11). Prior to January 6, 2021, Shroyer traveled with InfoWars to Washington, D.C., to attend the Stop the Steal rally and surrounding events (*id.*).

On January 6, 2021, Shroyer joined the mob that was attacking the U.S. Capitol, and illegally entered and remained in the restricted area of the Capitol grounds (ECF 39, ¶¶ 1-7, 14-16). Shroyer entered the restricted grounds on the Capitol's west front, where he proceeded to stand on stacks of chairs and other equipment and lead the crowd in chants of "USA! USA! USA!" (*id.* ¶ 14). Eventually, Shroyer made his way to the east side of the Capitol (*id.* ¶ 15). He and others in his group entered the Capitol building's east steps with their hands on each other's backs and shoulders in a "stack," snaking through hundreds of other

rioters, deeper into the restricted area (*id.*). They nearly reached the top of the steps, where Shroyer used his megaphone to lead the large crowd in various chants, including, "USA!" and "1776!" (*id.*).

In addition to violating § 1752(a)(1), Shroyer's conduct on January 6 also violated his February 2020 deferred-prosecution agreement (ECF 39, ¶¶ 8-10). That agreement resulted from Shroyer's conduct in December 2019, when he allegedly disrupted a House Judiciary Committee meeting in the Longworth House Office Building by jumping out of his seat and shouting in a loud manner (*id.*). Under his deferred-prosecution agreement, Shroyer agreed not to violate any laws and to follow certain conditions (*id.* ¶ 9). Specifically, he agreed not to "utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct" on the Capitol Grounds with the intent to impede, disrupt, or disturb congressional proceedings (*id.*). The agreement included a map that demarcated the "U.S. Capitol and Grounds" (*id.*). The agreement was still in effect on January 6, 2021, and Shroyer's conduct within the restricted area on January 6 occurred

within the broader "U.S. Capitol and Grounds" boundaries imposed by his deferred-prosecution agreement (*id.* ¶¶ 10, 14).[1]

### B. Shroyer Pleaded Guilty and Agreed to Waive the Right to Appeal a Sentence Within the Guidelines.

On August 25, 2021, Shroyer was charged by a four-count information for his conduct on January 6 (ECF 5). He was charged with: entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly conduct on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and obstructing or impeding passage through or within the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(E) (Count Four) (*id.*).

On June 23, 2023, Shroyer pleaded guilty to Count One pursuant to a written plea agreement (Minute Entry 6/23/23; ECF 38). In return,

---

[1] In his motion for release, Shroyer states (at 11) that the government "attempted to mislead" the court at sentencing regarding the status of his deferred prosecution agreement. This is wrong. The agreement was still in effect on January 6, 2021, because Shroyer had not completed his required hours of community service (ECF 39, ¶ 10). Indeed, at sentencing, Shroyer acknowledged that he completed his hours "after January 6th" (Sentc'g Tr. at 35:10-20).

the government agreed to dismiss Counts Two through Four at sentencing and not to prosecute any other charges based on the conduct described in the statement of offense (ECF 38 at 2). As to a potential sentence, the parties agreed that under the Sentencing Guidelines, the estimated offense level "will be at least 4," and Shroyer's criminal history category "is estimated to be II" (*id.* at 3). Thus, Shroyer's "Estimated Guidelines Range" was "0 months to 6 months" (*id.*).

The plea agreement also contained an explicit appeal waiver:

> Your client agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claim(s) that (1) the statute(s) to which your client is pleading guilty is unconstitutional, and (2) the admitted conduct does not fall within the scope of the statute(s). Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client also agrees to waive the right to appeal the sentence in this case, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, except to the extent the Court sentences your client above the statutory maximum or guidelines range determined by the Court. In agreeing to this waiver, your client is aware that your client's sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this

Agreement. Notwithstanding the above agreement to waive the right to appeal the conviction and sentence, your client retains the right to appeal on the basis of ineffective assistance of counsel, but not to raise on appeal other issues regarding the conviction or sentence.

(ECF 38 at 7.)

Further, the parties agreed that "a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver" (ECF 38 at 4).

Shroyer signed the plea agreement on June 21, 2023, affirming that he had "read every page of this Agreement," "discussed it with [his] attorney," "fully underst[ood]" the agreement, and "agree[d] to it without reservation . . . voluntarily and of [his] own free will, intending to be legally bound" (ECF 38 at 11).

The district court conducted a plea colloquy. The court determined that Shroyer was competent to enter a plea and was doing so freely and voluntarily (Plea Hr'g Tr. at 6:16-19, 27:1-10).[2] The court verified that

---

[2] We have attached the relevant transcripts of these proceedings as exhibits to this motion.

7

Shroyer had the opportunity to review the plea agreement with his lawyer and was satisfied with his legal representation (*id.* at 25:9-15). The Court also reviewed the plea agreement's terms with Shroyer, including the appeal waiver (*id.* at 17:6-25:13). Shroyer confirmed that by pleading guilty, he was agreeing to "giv[e] up [his] right to appeal the sentence," except to the extent the sentence is "above the statutory maximum . . . or the guidelines range that [the district judge] determine[s]," or in the event that Shroyer "assert[s] that [he] received ineffective assistance of counsel" (*id.* at 24:5-13). Shroyer further confirmed he understood that his "right to appeal would be limited to those issues" (*id.* at 24:11-13). The court confirmed that Shroyer understood the sentencing consequences of his plea (*id.* at 19:6-23:18). Based upon the inquiry, the court accepted Shroyer's guilty plea (*id.* at 27:1-10).

## C.   The District Court Imposed a Within-Guidelines Sentence of 60 Days' Incarceration.

Both parties filed sentencing memoranda prior to sentencing. The government recommended a sentence of 120 days' incarceration—close to

the middle of the Guidelines range (ECF 46 at 1).[3] In support of this recommendation, the government noted that Shroyer had violated his deferred-prosecution agreement through his conduct on January 6; "stoked the fire of hundreds of thousands of his followers with violent rhetoric and disinformation about the election leading up to January 6 and during a march he helped lead to the restricted grounds"; and "praised the actions of the rioters at the Capitol after January 6 on his online streaming show" (*id.* at 2). Invoking the sentencing factors in 18 U.S.C. § 3553(a), the government argued that Shroyer's actions and statements informed the nature and circumstances of the offense, the need for adequate punishment to reflect the seriousness of the offense, and the importance of deterring Shroyer from engaging in similar future conduct (*id.* at 18-21, 23-24).

Shroyer requested a sentence of supervised release, or alternatively, a fine (ECF 48). He objected to the government's "attempt to use Mr. Shroyer's speech as relevant offense conduct" (ECF 49 at 5).

---

[3] In addition to 120 days' incarceration, the government recommended 12 months of supervised release, 60 hours of community service, and $500 in restitution (ECF 46 at 1).

In his view, reliance on his speech would violate his First Amendment rights (*see generally id.*).

The district court sentenced Shroyer on September 12, 2023. The court determined—and the parties agreed—that the applicable Sentencing Guidelines range was zero to six months of imprisonment (Sentc'g Hr'g Tr. at 7:10-16). Before imposing the sentence, the court addressed Shroyer's First Amendment concerns. Specifically, the court gave "little to no weight" to Shroyer's statements before January 6, and emphasized that Shroyer had the right to say things like "the election was stolen" (*id.* at 13:1-9). In contrast, the court viewed as "fair game" those statements Shroyer made while committing the offense, such as statements "amping up the crowd while on the steps of the Capitol" (*id.* at 12:17-13:1). Moreover, the court concluded that Shroyer's statements after January 6 demonstrated a lack of complete remorse (*id.* at 44:11-20).[4]

_____

[4] As to Shroyer's lack of remorse, the district court relied on the entire record "including some of the statements the Government has brought to my attention" (Sentc'g Hr'g Tr. at 44:14-16). Those statements consisted of Shroyer's remarks like, "January 6 got a little out of control," but "frankly, at a certain level, we should have been proud of it" (ECF 46 at 14). Shroyer also asserted that the FBI should be investigated for their

(continued . . . )

The district court sentenced Shroyer to 60 days of imprisonment, 12 months of supervised release, and $500 in restitution (ECF 50). The court articulated "the three things" driving its decision: (1) Shroyer's violation of his deferred-prosecution agreement; (2) Shroyer's "role in amping up the crowd on the Capitol steps by leading chants that day"; and (3) Shroyer's refusal to truly disavow the events of January 6 (Sentc'g Hr'g Tr. at 44:2-22).

## D.    The District Court's Denial of Shroyer's Motion for Release Pending Appeal.

Despite his appeal waiver, Shroyer noticed an appeal on September 19, 2023, which was docketed in this Court on September 21, 2023. Shroyer also moved in the district court for release pending appeal, arguing that his appeal would raise a substantial question as to whether the court impermissibly relied on his protected speech in sentencing him to 60 days of imprisonment (ECF 52). The government opposed on the ground that Shroyer's appeal was foreclosed by the appellate waiver in his plea agreement, and in any event, Shroyer had not raised a

---

role on January 6, and he claimed that "Democrats stood down security intentionally" (*id.* at 15).

substantial question as to whether his First Amendment rights were violated (ECF 55).

On October 13, 2023, the district court denied Shroyer's motion (ECF 58). The court did not address whether the plea agreement precluded Shroyer's challenge to his sentence (*id.* at 6). Instead, the court denied Shroyer's request for release pending appeal because he had not shown that his appeal would raise a substantial legal question entitling him to relief (*id.* at 7-11). Consistent with its statements at sentencing, the court explained it had "relied on two aspects of Shroyer's speech-related conduct to determine his sentence" (*id.* at 4). First, Shroyer "play[ed] a role in amping up the crowd on the Capitol steps that day" (*id.*, quoting Sentc'g Hr'g Tr. at 43). This conduct was significant because of its context, not its content—Shroyer "exacerbated a highly treacherous situation for Capitol police officers, Congress, and the peaceful transfer of presidential power" (*id.*). Second, Shroyer "publicly expressed pride well after January 6 about what happened at the Capitol that day" (*id.*). This showed that he "was not fully remorseful" (*id.*). In contrast, the court had "assigned no weight to Shroyer's statements before January 6" because, in the court's view, "these statements added little if anything to

the nature and circumstances of the offense to which he pleaded guilty" (*id.*). Thus, the court considered Shroyer's speech-related conduct because it was directly tied to § 3553(a) sentencing factors that the court had a duty to consider (*see id.* at 9-10).[5]

Shroyer now moves in this Court for release pending appeal. He requests emergency consideration (at 1) because he is scheduled to report to the Bureau of Prisons to serve his 60-day sentence of incarceration on October 24, 2023.

## ARGUMENT

### I. The Court Should Enforce the Plea Agreement and Dismiss Shroyer's Appeal.

This Court will "ordinarily dismiss an appeal" when a defendant, such as Shroyer, attempts to appeal a sentence in the face of an appeal waiver. *United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016). "A defendant may waive his right to appeal his sentence as long as his

---

[5] Moreover, the court noted that it "would have sentenced Shroyer to a term of imprisonment even if it could not consider any of his speech-related conduct, largely because in committing his offense on January 6, he violated his deferred prosecution agreement, which underscored the need to deter him from engaging in additional criminal conduct" (ECF 58 at 6 n.2). Thus, even if Shroyer were to succeed in his appeal, he would not be eligible for release on the ground that the appeal would likely result in a "sentence that does not include a term of imprisonment" (*id.*).

decision is knowing, intelligent, and voluntary." *United States v. Guillen*, 561 F.3d 527, 529 (D.C. Cir. 2009). "An anticipatory waiver—that is, one made before the defendant knows what the sentence will be—is nonetheless a knowing waiver if the defendant is aware of and understands the risks involved in his decision." *Id.* Whether a defendant waived his right to appeal his sentence is a question that the Court reviews de novo. *Hunt*, 843 F.3d at 1027.

Here, Shroyer does not dispute that he knowingly, intelligently, and voluntarily waived his right to appeal his sentence. Nor does he claim that his sentence falls within one of the appeal waiver's specified exceptions. Indeed, the record would not support any such arguments. Unequivocally, Shroyer knew that he was waiving his ability to appeal his sentence (*see, e.g.*, Plea Hr'g Tr. at 24:5-13).

Shroyer now claims, however, that the district court's "use of protected speech as relevant offense conduct is reviewable notwithstanding an appellate waiver" because "[i]t is never permissible to burden or chill protected speech in the context of a criminal sentencing" (Motion at 3). According to Shroyer, the district court's "reliance on protected speech" at sentencing "is the sort of structural

error that permits an appeal even though the sentence is less than the maximum contemplated by an appellate waiver" (*id.* at 2). This Court should reject Shroyer's effort to subvert the plea agreement.

A "waiver of the right to appeal a sentence is presumptively valid and is enforceable if the defendant's decision to waive is knowing, intelligent, and voluntary." *United States v. Lee*, 888 F.3d 503, 506 (D.C. Cir. 2018) (quoting *In re Sealed Case*, 702 F.3d 59, 63 (D.C. Cir. 2012)). Shroyer's claim of substantive unreasonableness does not negate the appellate waiver. Such waivers apply equally to procedural and substantive challenges to a sentence. *See United States v. Ortega-Hernandez*, 804 F.3d 447, 451-52 (D.C. Cir. 2015) (enforcing appellate waiver in plea agreement where defendant argued his sentence was procedurally and substantively unreasonable). "If an appeal waiver were not enforced in the 'mine run of cases,' the government would cease to rely on it and the waiver would lose its value as a bargaining chip for the defendant." *Khadr v. United States*, 67 F.4th 413, 421 (D.C. Cir. 2023) (citing *United States v. Adams*, 780 F.3d 1182, 1184 (D.C. Cir. 2015)).

Shroyer cites no authority for his assertion that "the use of protected speech as relevant offense conduct is reviewable

notwithstanding an appellate waiver" (Motion at 3). Although this Court has recognized that it may disregard an appellate waiver to avoid a "miscarriage of justice," such as "a sentence *colorably alleged* to rest upon a constitutionally impermissible factor, such as the defendant's race or religion," *Guillen*, 561 F.3d at 531 (emphasis added), Shroyer has not "colorably alleged" that his sentence "rest[s] upon a constitutionally impermissible factor" such that his appellate waiver may be discarded. *See id.*

Shroyer's invocation of the First Amendment does not vitiate his appeal waiver. He acknowledges that the Constitution "does not prevent a sentencing court from considering an individual's First Amendment-protected 'beliefs and associations' in fixing a sentence, when those beliefs and associations are relevant to determining an appropriate sentence" (Motion at 3, citing *Dawson v. Delaware*, 503 U.S. 159, 165 (1992)). In particular, a sentencing court may consider a defendant's speech "to evaluate the degree of the defendant's remorse, . . . the likelihood of reoffending, . . . , or the extent of punishment needed for deterrence[.]" *United States v. Alvarez-Nunez*, 828 F.3d 52, 56 (1st Cir. 2016) (citations omitted); *see also, e.g., Kapadia v. Tally*, 229 F.3d 641,

648 (7th Cir. 2000) ("Nothing in the Constitution prevents the sentencing court from factoring a defendant's statements into sentencing when those statements are relevant to the crime or to legitimate sentencing considerations."); *United States v. Stewart*, 686 F.3d 156, 167 (2d Cir. 2012) ("The district court's reading of 18 U.S.C. § 3553(a)'s broad constellation of factors to . . . permit[ ] review of the defendant's public statements indicating that she considered her sentence to be trivial, or exhibiting a lack of remorse, does not violate her right to speak under First Amendment principles as we understand them.").

Here, Shroyer asserts that "mere abstract advocacy of lawlessness is protected speech" and argues that he was improperly punished for this protected speech (Motion at 6). Specifically, he claims that the district court erred when it relied on his speech in two instances—Shroyer's "amping up the crowd on the Capitol steps by leading chants" on January 6, and Shroyer's post-January 6 statements demonstrating a lack of genuine remorse (*id.* at 13-14). These claims fail.

The district court appropriately focused upon Shroyer's statements in the context of the charged offense. The district court explained that Shroyer's amping up the crowd on the Capitol steps informed "the nature

and circumstances of the offense"—a sentencing factor the court was required to consider under 18 U.S.C. § 3553(a)(1) (Sentc'g Hr'g Tr. at 40:8-41:11). In examining the gravity of the offense and Shroyer's particular conduct on January 6, the district court deemed it significant that "Shroyer chanted *while* he committed the offense, just steps away from several entrances to the Capitol Building, surrounded by a mob that eventually broke into the building, endangered members of Congress, and obstructed their ability to certify the Electoral College vote" (ECF 58 at 8). The district court did not penalize Shroyer for his abstract beliefs; the court instead considered Shroyer's willingness to commit crimes that endangered other people in furtherance of those beliefs. *See, e.g., United States v. Brown*, 26 F.4th 48, 67 (1st Cir. 2022) (district court could consider beliefs of defendant in tax-fraud case about the illegitimacy of the government; "The problem is that he acts on his beliefs, and, by acting on his beliefs, he put in danger multiple individuals.").

Shroyer's post-January 6 statements showed his failure to express complete remorse for the day's events and the need for future deterrence (Sentc'g Hr'g Tr. at 44:11-22)—also relevant sentencing considerations. *See, e.g., United States v. DeChristopher*, 695 F.3d 1082, 1098 (10th Cir.

2012) ("Defendant's statements that he would 'continue to fight' and his view that it was 'fine to break the law' were highly relevant to the[ ] sentencing factors."); *United States v. Smith*, 424 F.3d 992, 1016-17 (9th Cir. 2005) (no error in considering the defendant's allocution statements, including about the district court's "lack of jurisdiction," because they were relevant to the defendant's remorse and threat to the public on release); *United States v. Simkanin*, 420 F.3d 397, 417-18 (5th Cir. 2005) (finding no constitutional error where the district court relied on the defendant's "specific beliefs that the tax laws are invalid and do not require him to withhold taxes or file returns . . . [because they] are directly related to the crimes in question and demonstrate a likelihood of recidivism").

Shroyer also complains about other speech on which the district court did *not* rely in sentencing him. In particular, he points to the government's arguments at sentencing regarding Shroyer's pre-January 6 rhetoric, and the inflammatory statements Shroyer made on January 6 before trespassing at the Capitol (*e.g.*, Motion at 1-2, 16). But as the district court made clear, Shroyer's sentence did not rest on any of these statements (Sentc'g Hr'g Tr. at 44:2-22 (identifying "the three things" on

19

which the sentence rested)). Thus, because the court did not rely on them, these statements cannot support an argument that Shroyer's sentence rested upon a constitutionally impermissible factor.[6] *Cf. In re Sealed Case*, 527 F.3d 188, 193 (D.C. Cir. 2008) (explaining that appellate review of a sentence hinges on the sentencing court's statement of reasons); *United States v. Abu-Ghosh*, 848 Fed. App'x 437, 438 (D.C. Cir. 2021) ("When a district court offers valid and sufficient grounds for a sentence . . . '[w]e take the district court at its word.'" (quoting *United States v. Monzel*, 930 F.3d 470, 485 (D.C. Cir. 2019)).

Finally, Shroyer discusses several cases addressing the circumstances under which speech can satisfy an essential element of a criminal offense or tort claim (Motion at 6-10, 14-20). He asserts that his speech "was not relevant to prove an element of an offense charged" (*id.* at 1), and does not "pack[ ] the inculpatory punch of prohibited speech, whether that be incitement, a true threat, or conspiracy to commit another crime" (*id.* at 17). He essentially claims his speech was entirely immunized from consideration at sentencing (*id.*). However, Shroyer

---

[6] Though the district court did not rely on these statements in sentencing Shroyer, the government maintains that these statements permissibly informed the required sentencing factors and could have been considered.

conflates speech that is itself prohibited or inculpatory, which is not at issue here, with a court's reliance on speech to inform the relevant sentencing factors prescribed by Congress. And as discussed, it is well settled that a court may consider speech that informs legitimate sentencing considerations, which is what the district court did here.[7]

In sum, Shroyer has not colorably alleged that his sentence rests upon a constitutionally impermissible factor such that enforcement of the appeal waiver would cause a miscarriage of justice. *See Guillen*, 561 F.3d at 531. Indeed, if his appeal were allowed to proceed, the appeal waiver would be rendered meaningless because it would allow defendants like Shroyer to "dress up [their] claim[s] as a violation of the [First] Amendment, when in reality, [they are] challenging the [length] of [their] sentence[s]." *See United States v. Djelevic,* 161 F.3d 104, 107 (2d Cir. 1998).

---

[7] Shroyer also argues that the court's consideration of his speech is similar to the use of acquitted conduct at sentencing (Motion at 20-21). Shroyer does not explain how the two situations are analogous (*see id.*). Regardless, a sentencing judge in this Circuit may consider acquitted conduct. *United States v. Settles*, 530 F.3d 920, 923-24 (D.C. Cir. 2008); *United States v. Khatallah*, 41 F.4th 608, 651 (D.C. Cir. 2022) (Millett, J., concurring) (recognizing that *Settles* remains good law). Moreover, Shroyer's speech on January 5 and 6 is expressly part of the statement of offense that formed the basis for his guilty plea (ECF 39).

Appeal waivers contained in plea agreements serve important interests of the defendant and the government. *Hunt*, 843 F.3d at 1027. Shroyer has received the benefit of the government's promised recommendations. His reciprocal obligation to waive his right to appeal should be enforced. *See Guillen*, 561 F.3d at 532 (dismissing appeal challenging sentence based on valid appeal waiver); *United States v. Zapata Espinoza*, 830 Fed. App'x 324, 327 (D.C. Cir. 2020) (applying appeal waiver where the defendant failed to show that its enforcement would amount to a miscarriage of justice); *United States v. Buchanan*, 131 F.3d 1005, 1008 (11th Cir. 1997) ("Requiring the government to file an appeal brief even though there is an appeal waiver substantially diminishes the value of the waiver to the government, and by extension to defendants . . . .").

## II. Shroyer Has Not Met the Standard for Release Pending Appeal.

Even if the Court were inclined to look past the appellate waiver at this stage, it should deny Shroyer's motion for release pending appeal. A defendant who has been found guilty and sentenced to a term of imprisonment "shall" be detained pending appeal unless the court finds that (A) the defendant is not likely to flee or pose a danger to others, and

(B) the appeal is not for the purpose of delay "and raises a substantial question of law or fact likely to result in—(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1). A "substantial question" is a "close question or one that very well could be decided the other way." *United States v. Perholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987) (internal quotation omitted).

An application for release pending appeal must be first made in the district court, and the district court's decision is entitled to "respectful consideration." *United States v. Stanley*, 469 F.2d 576, 584 (D.C. Cir. 1972). Here, the district court correctly concluded that Shroyer must be detained pending appeal because he fails to present "a substantial question of law or fact likely to result in" a reduced sentence or a sentence that does not include a term of imprisonment. § 3143(b)(1)(B).

As discussed, Shroyer's First Amendment challenge to his sentence raises no "substantial question of law or fact" likely to result in a reduced sentence or a sentence of no imprisonment. The court properly rested

Shroyer's sentence not on his speech or beliefs in the abstract, but rather on the statutory sentencing factors, including the nature and circumstances of Shroyer's offense, the need to deter future criminal conduct by Shroyer, and his lack of genuine remorse (Sentc'g Hr'g Tr. at 40:8-44:22). The district court considered Shroyer's speech during and after the offense, *id.*, and appropriately explained how that speech was "relevant to determining an appropriate sentence," *United States v. Williamson*, 903 F.3d 124, 136 (D.C. Cir. 2018).

Shroyer cannot otherwise show that his sentence was substantively unreasonable. His sentence is not "so unreasonably high" given "the facts and circumstances of the offense and offender" that it warrants reversal. *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). Shroyer's sentence of 60 days' incarceration is below the midpoint of the applicable Guidelines range of zero to six month of imprisonment (Sentc'g Hr'g Tr. at 7:10-16). Indeed, in his plea agreement, Shroyer agreed that a sentence within the Guidelines range of zero to six months would be reasonable (ECF 38 at 4). Given these facts, Shroyer has not shown a substantial question as to the substantive unreasonableness of his sentence. *See United States v. Mattea*, 895 F.3d 762, 769 (D.C. Cir. 2018)

(rejecting argument that a within-Guidelines sentence was substantively unreasonable, "especially given that [the defendant] himself conceded in his plea agreement that any within-Guidelines sentence would be 'reasonable'").

For these reasons, Shroyer has failed to rebut the presumption of detention at this stage. *See* 18 U.S.C. § 3143(b)(1). His motion for release pending appeal should be denied.

CONCLUSION

WHEREFORE, the government respectfully requests that the Court enforce the plea agreement and dismiss Shroyer's appeal. In the alternative, the government requests that the Court deny Shroyer's motion for release pending appeal.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
Assistant United States Attorney

_____/s/_____
MARY C. FLEMING
D.C. Bar # 1048019
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Mary.Fleming@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 27(d)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this combined motion and response contains 5,027 words, and therefore complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). This motion and response has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
MARY C. FLEMING
Assistant United States Attorney


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing combined motion and response to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Norman Pattis, Esq., on this 23rd day of October, 2023.

/s/
MARY C. FLEMING
Assistant United States Attorney

# EXHIBITS

# EXHIBITS

## INDEX

06/23/23 Transcript of Plea Agreement Hearing………Exhibit 1

09/12/23 Transcript of Sentencing Hearing……………Exhibit 2

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        CR No. 1:21-cr-00542-TJK-1

v.                        Washington, D.C.
                             Friday, June 23, 2023

JONATHON OWEN SHROYER,     10:00 a.m.

               Defendant.

- - - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF PLEA AGREEMENT HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the United States:   Kimberly L. Paschall, Esq.
                     Troy A. Edwards, Jr., Esq.
                     U.S. ATTORNEY'S OFFICE
                     555 Fourth Street, NW
                     Washington, DC 20530
                     (202) 252-2650

For the Defendant:      Norman A. Pattis, Esq.
                     PATTIS & SMITH, LLC
                     383 Orange Street
                     1st Floor
                     New Haven, CT 06511
                     (203) 393-3017

Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                     Official Court Reporter
                     U.S. Courthouse, Room 6722
                     333 Constitution Avenue, NW
                     Washington, DC 20001
                     (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

2

1                     **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  This is Criminal Matter 21-542,

3        United States of America v. Jonathon Owen Shroyer.

4              Present for the Government are Troy Edwards and

5        Kimberly Paschall; present for the defendant is Norman

6        Pattis; also present is the defendant, Mr. Shroyer.

7              THE COURT:  All right.  Well, good morning to

8        everyone.

9              We are here -- Mr. Shroyer is here today to enter

10       a plea of guilty to Count 1 of the information charging him

11       with entering and remaining in a restricted building or

12       grounds, in violation of 18 United States Code Section

13       1752(a)(1).

14             Mr. Pattis, do I have all of that correct, sir?

15             MR. PATTIS:  You do, Judge.

16             THE COURT:  All right.  If you and your client

17       will approach the podium, Ms. Harris will administer the

18       oath to Mr. Shroyer.

19             THE DEPUTY CLERK:  Can you please raise your right

20       hand.

21             Do you solemnly swear or affirm that you will well

22       and truly answer all questions propounded to you by the

23       Court?

24             THE DEFENDANT:  Yes.

25             THE DEPUTY CLERK:  Thank you.

```
1              THE COURT:  All right.  Mr. Shroyer, sir, do you

2     understand you're now under oath -- if you'll approach the

3     podium a little closer -- no, just right here.  Yeah, we

4     have a microphone here that we need to speak into.  Perfect.

5              Do you understand, sir, that you are now under

6     oath and that if you don't answer my questions truthfully,

7     you could be prosecuted for perjury or for making a false

8     statement?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Okay.  Now, the purpose of our hearing

11    is for you to enter a plea of guilty to a criminal charge

12    against you.  This is, obviously, an important decision for

13    you, whether to go to trial or to plead guilty.  And so it's

14    an important hearing for all the reasons I'm about to

15    explain.

16             It's important because in order for me to accept

17    your guilty plea, I need to be satisfied that you are

18    capable of understanding all the implications that come with

19    pleading guilty and that you are entering your guilty plea

20    voluntarily; that is, of your own free will.

21             It's also important because whenever anyone

22    chooses to plead guilty, they give up many of their

23    constitutional rights, and I want to make sure you

24    understand the rights you are giving up by deciding to plead

25    guilty today.
```

```
 1              And last, this important -- this hearing is
 2      important because before you plead guilty, I want to make
 3      sure you understand the charges against you, the plea
 4      agreement that your lawyer has negotiated with the
 5      Government, and exactly how sentencing will work.  So if, at
 6      any point during today's hearing, there's something you
 7      don't understand, I want you to let me know and I'll try to
 8      explain it better, and if that doesn't work we can even take
 9      a break and you can talk to Mr. Pattis about it.
10              Anything about that you don't understand, sir?
11              THE DEFENDANT:  No, Your Honor.
12              THE COURT:  All right.
13              MR. PATTIS:  (Indicating.)
14              THE COURT:  Mr. Pattis, yes?
15              MR. PATTIS:  Mr. Edwards and I have engaged in
16      extensive negotiations about this.  At some point, Judge, I
17      would like permission to do a brief canvass of Mr. Shroyer
18      myself during your canvass to assure the Government that
19      this is a truthful plea.  The context will be clear with the
20      questioning.  It would be four or five questions.  I have
21      discussed them with Mr. Edwards.  With your permission, at
22      some point, I'd like to do that.
23              THE COURT:  When we get to the factual basis.
24              MR. PATTIS:  Yes, sir.
25              THE COURT:  All right.  Very well.
```

```
 1                    All right.  Mr. Shroyer, let me start with a few
 2       questions, sir.
 3                    First, what is your full name?
 4                    THE DEFENDANT:  Jonathon Owen Shroyer.
 5                    THE COURT:  All right.  And how old are you, sir?
 6                    THE DEFENDANT:  Thirty-three.
 7                    THE COURT:  How far did you go in school?
 8                    THE DEFENDANT:  I graduated with a bachelor's
 9       degree.
10                    THE COURT:  Okay.  Then I presume you can read and
11       write.
12                    THE DEFENDANT:  Yes, sir.
13                    THE COURT:  All right.  And where were you born?
14                    THE DEFENDANT:  St. Louis, Missouri.
15                    THE COURT:  And are you a U.S. citizen today?
16                    THE DEFENDANT:  Yes, sir.
17                    THE COURT:  Okay.  You've told me that you are a
18       U.S. citizen.  Do you understand that if you were not a U.S.
19       citizen -- if you were not -- your immigration status could
20       be affected by your guilty plea, including causing your
21       deportation, exclusion from the United States, or denial of
22       citizenship under our immigration laws?  Do you understand
23       that, sir?
24                    THE DEFENDANT:  Yes, Your Honor.
25                    THE COURT:  Okay.  Have you taken any alcohol,
```

6

1    drugs, or medicine in the last 48 hours that could affect

2    your ability to understand and follow our proceedings today?

3                  THE DEFENDANT:  No, Your Honor.

4                  THE COURT:  And have you received any treatment

5    recently for any type of mental illness or emotional

6    disturbance?

7                  THE DEFENDANT:  No, Your Honor.

8                  THE COURT:  And let me ask both the prosecutor and

9    defense counsel.  Have I -- do either of you have any reason

10   to question Mr. Shroyer's competence to plead guilty here

11   today?

12                  Mr. Pattis?

13                  MR. PATTIS:  I do not.

14                  MR. EDWARDS:  No, Your Honor.

15                  THE COURT:  Mr. Edwards?  Thank you.

16                  All right.  So based on Mr. Shroyer's responses to

17   my questions, my observations of him, and the

18   representations of counsel, I do find that he's competent

19   and capable of entering an informed plea.

20                  Now, Mr. Shroyer, let's talk a little bit about

21   those constitutional rights we mentioned just a moment ago.

22   Again, please listen carefully to my questions.  Let me know

23   if there's anything you don't understand.

24                  The first document we'll talk about here today is

25   a document entitled -- titled waiver of trial by jury.  It

```
 1    appears to have your signature on it.  Is that your
 2    signature on this document, sir?
 3              THE DEFENDANT:  Yes, Your Honor.
 4              THE COURT:  Okay.  Is it your intention to give up
 5    your jury trial right?
 6              THE DEFENDANT:  Yes, Your Honor.
 7              THE COURT:  All right.  Let's discuss those jury
 8    trial rights for a moment.
 9              You have the right to plead not guilty and to have
10    a jury trial in this case.  Do you understand that you have
11    the right to plead not guilty?
12              THE DEFENDANT:  Yes, Your Honor.
13              THE COURT:  And if you were to plead not guilty,
14    you would have a jury trial in which your guilt or innocence
15    would be determined by a jury based on evidence presented in
16    this courtroom.  Do you understand that, sir?
17              THE DEFENDANT:  Yes, Your Honor.
18              THE COURT:  All right.  And do you understand that
19    if you had a trial, you would have a right to be represented
20    by your lawyer at that trial and at every other stage in the
21    proceeding?
22              THE DEFENDANT:  Yes, Your Honor.
23              THE COURT:  Do you understand that that lawyer
24    could make motions on your behalf, including motions to
25    exclude evidence or statements from the trial?
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Do you understand that at trial, you

3    would have the right, through your lawyer, to confront and

4    cross-examine any witnesses against you?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Do you understand that at a trial, you

7    would have the right to present your own witnesses and that

8    you would have a right to require or to compel those

9    witnesses to testify in your defense?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Do you understand that if there were a

12    trial, you would have the right to testify and to present

13    evidence on your behalf, if you wanted to, but that no one

14    could force you to testify or present any evidence if you

15    did not want to because you have the right to remain silent

16    at your trial?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  And if you were to make a decision not

19    to testify at trial, you could request that the jury be told

20    that that could not be held against you.  Do you understand

21    that, as well?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Do you understand that unless and

24    until I accept your guilty plea, you are, of course,

25    presumed by the law to be innocent because it's the

1    Government's burden to prove your guilt beyond a reasonable

2    doubt and until it does you cannot be convicted at trial?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Okay.  Do you understand if -- that if

5    you went to trial and were convicted, you would have a right

6    to appeal and to a lawyer help -- to help you prepare that

7    appeal?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  And do you understand that by pleading

10   guilty, you are giving up all the rights I just explained to

11   you with a few exceptions as to your appeal rights that we

12   will go over because there will be no trial?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Having discussed these rights with

15   you, do you still want to plead guilty in this case and to

16   give up those rights?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  Okay.  Now, the second document we

19   will discuss, Mr. Shroyer, is called a statement of offense.

20   Again, it's a -- well, an eight-page document.  And, again,

21   the last page of that document appears to have your

22   signature on it.  It's a document that lays out what the

23   Government would be -- would have been prepared to prove had

24   this case gone to trial.  Let me just ask first.  Is that

25   your signature on the last page of this document, sir?

```
 1              THE DEFENDANT:  Yes, Your Honor.

 2              THE COURT:  Okay.  And have you read this document

 3     and discussed it fully with your attorney?

 4              THE DEFENDANT:  I have, Your Honor.

 5              THE COURT:  Okay.  And is everything in the

 6     document true and accurate?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  And is it true, then, that you

 9     knowingly entered and remained on the U.S. Capitol's

10     restricted grounds without the authority to do so, as the

11     document describes?

12              THE DEFENDANT:  Yes, Your Honor.

13              THE COURT:  All right.  Mr. Pattis, if you have

14     additional questions of your client that you've discussed

15     with the Government, I'll recognize you to ask them now.

16              MR. PATTIS:  Mr. Shroyer, the judge just showed

17     you a document that described the offense conduct here;

18     correct?

19              THE DEFENDANT:  Yes.

20              MR. PATTIS:  And you've had an opportunity to

21     discuss it with me on numerous occasions?

22              THE DEFENDANT:  Yes.

23              MR. PATTIS:  We met last night to discuss it?

24              THE DEFENDANT:  Correct.

25              MR. PATTIS:  We discussed it again this morning?
```

1          THE DEFENDANT:  Yes.

2          MR. PATTIS:  I've brought to your attention

3    certain concerns the Government has about statements you've

4    made in public places regarding this case; correct?

5          THE DEFENDANT:  Yes.

6          MR. PATTIS:  And in some of those statements,

7    you've referred to the fact that you believe you -- you

8    asserted your innocence; correct?

9          THE DEFENDANT:  Yes.

10          MR. PATTIS:  But yet in this document, you're

11    asserting that these offenses are true; correct?

12          THE DEFENDANT:  Yes.

13          MR. PATTIS:  And I've explained to you that there

14    is no such thing -- well, that this Court -- the

15    Government -- neither the Government nor this Court will

16    accept what's known as an Alfred plea, a plea that permits

17    you to hedge your bets and say, "Well, you know, kind of,

18    but I want to get this over."  You understand that; correct?

19          THE DEFENDANT:  Yes.

20          MR. PATTIS:  By taking the oath and answering the

21    questions that the judge gave you, are you swearing to the

22    truth of each and every statement that we reviewed -- or

23    fact that we reviewed in that document?

24          THE DEFENDANT:  Yes.

25          MR. PATTIS:  Notwithstanding anything you've said

1    in any other location?

2                    THE DEFENDANT:  No.

3                    MR. PATTIS:  Well, that's a double negative.

4                    If, on a prior occasion, you asserted your

5    innocence when you were not under oath but you are here

6    today asserting your guilt while you are under oath, are you

7    telling the truth today?

8                    THE DEFENDANT:  Yes.

9                    THE COURT:  All right.  Fair --

10                   MR. PATTIS:  May I speak with Mr. Edwards for a

11   moment, Judge?  This was a --

12                   THE COURT:  Sure.

13                   MR. PATTIS:  -- hard bargain --

14                   THE COURT:  Sure.  I understand.

15                   MR. PATTIS:  There's one additional issue, Judge.

16                   THE COURT:  I may know what you're going to say,

17   but go ahead.

18                   MR. PATTIS:  We'd like to withdraw the motion to

19   dismiss --

20                   THE COURT:  Oh.  That --

21                   MR. PATTIS:  -- and --

22                   THE COURT:  Go ahead.

23                   MR. PATTIS:  -- I wanted to alert something -- you

24   to something you may have seen.

25                   There's a paragraph in the motion to dismiss --

1 there is an affidavit attached to the -- some of the

2 pleadings in this case from you; correct?  And we've

3 discussed that?  An affidavit that you've signed.

4    THE DEFENDANT:  Yes.

5    MR. PATTIS:  And in that affidavit, you assert

6 seeing no signs alerting you that you could not be present

7 on the Capitol grounds that day; correct?

8    THE DEFENDANT:  Yes.

9    MR. PATTIS:  But nonetheless, you were aware,

10 based on the circumstances and the surrounding environment

11 and what you observed, that you were not permitted to be on

12 the grounds?

13    THE DEFENDANT:  Yes.

14    MR. PATTIS:  And yet you went to -- onto the

15 grounds; correct?

16    THE DEFENDANT:  Yes.

17    MR. PATTIS:  And remained on the grounds?

18    THE DEFENDANT:  Yes.

19    THE COURT:  All right.  The issue I was going to

20 raise -- a far more -- a less weighty point, but one I'll

21 just mention nonetheless -- the statement of offense, I

22 noticed as I was reviewing it, refers in the very first

23 paragraph to a different defendant.  It actually has just

24 another name.  It says, for example -- it says "Pursuant to

25 Rule 11," blah, blah -- "the United States, through its

1    attorney, and the defendant," and names another individual.

2    Obviously, I don't -- that's not -- neither here nor there,

3    given that the defendant in this case has signed this

4    document under his own name, Jonathon Owen Shroyer, and the

5    fact that he's, in open court here, indicated that it's true

6    and accurate.  I assume that's just a typo, but I just

7    wanted to --

8            MR. PATTIS:  I apologize, Judge.  In getting to

9    the meat of things, I just went right by that.

10           THE COURT:  It's, you know -- if anything, it's --

11   I -- it's a document, I assume, prepared more by the

12   Government than the defense, but in any event I just --

13           MR. PATTIS:  Nonetheless, I signed it.

14           THE COURT:  Fair enough.

15           MR. EDWARDS:  We'll also apologize, Your Honor.

16   It's admittedly a scrivener's error.  I hate to admit this

17   on the record.  I've dealt with this before.  And so what

18   we've done in the past -- if Your Honor is more comfortable

19   with this, happy to scratch that out, write his name, and

20   initial it, or if we just want it on the record now that

21   you've stated it, I'm -- the Government's fine with either

22   way.

23           THE COURT:  I don't think it's --

24           MR. EDWARDS:  Okay.

25           THE COURT:  -- necessary to do that.  He's --

15

```
 1              MR. EDWARDS:  Right.

 2              THE COURT:  He's signed it.  He's acknowledged it

 3     here.  It's -- obviously, it is a scrivener's error.

 4              All right.  Very well.  You can remain --

 5     Mr. Shroyer and Mr. Pattis, you can remain where you are

 6     while I ask Mr. Edwards to state the elements of the

 7     charges -- of the charge to which Mr. Shroyer is pleading

 8     guilty.

 9              MR. EDWARDS:  Yes, Your Honor.

10              Should the case have gone to trial, the Government

11     would have to prove beyond a reasonable doubt that the

12     defendant, Jonathon Owen Shroyer, knowingly entered a

13     restricted area and remained there, despite not having

14     lawful authority to do so, and that on January 6th the

15     Capitol building and grounds itself were considered

16     restricted grounds under 18 U.S.C. 1752(a)(1) as used in

17     that statute.

18              THE COURT:  All right.  Mr. Shroyer, do you

19     understand the charge against you, sir?

20              THE DEFENDANT:  Yes, Your Honor.

21              THE COURT:  And have you read the information that

22     was filed against you -- those are the written charges made

23     against you -- and have you fully discussed those charges

24     and the staircase in general with Mr. Pattis?

25              THE DEFENDANT:  Yes, Your Honor.
```

1          THE COURT:  All right.  And, Mr. Pattis, do you

2    agree the Government could prove all the elements of this

3    particular offense beyond a reasonable doubt?

4          MR. PATTIS:  Unfortunately, I do.

5          THE COURT:  All right.  The parties have

6    submitted -- the final document we will discuss here today

7    is a written letter outlining the plea agreement.

8          Before we discuss the terms of the agreement, let

9    me ask Mr. Edwards whether this is the most lenient or the

10   only plea offer made to the defendant in this case.

11         MR. EDWARDS:  Yes, Your Honor.  This is the only

12   offer that's been offered at this point.

13         THE COURT:  Okay.  Very well.

14         So Mr. Shroyer, same thing we've done before.  I'm

15   going to show you Page 11 of this document.  Again, it also

16   appears to have your signature on it.  Is that your

17   signature, sir?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Okay.  Do -- did you read and

20   understand this document before signing it?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  And have you had enough time to talk

23   to Mr. Pattis about it?

24         THE DEFENDANT:  I have, Your Honor.

25         THE COURT:  Okay.  We're going to discuss the

1    terms of this plea agreement now.  We may not discuss every

2    single thing that's in this document.  But you understand

3    that even if we don't discuss it here today, it's something

4    you've agreed to be bound by?  Do you understand that?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Okay.  Mr. Pattis, will you briefly

7    give us a, sort of, high-level overview of the terms of the

8    agreement.

9            MR. PATTIS:  Mr. Shroyer is waiving the rights

10   that the Court previously discussed.  And in exchange, he

11   submits that -- he agrees with the initial assessment that

12   it is a -- he's in a Criminal History II largely by

13   operation of being under supervision for a case that was

14   pending at the time of these events in the Superior Court.

15   He's entering the "entering and remaining" count.  His -- I

16   believe -- I don't -- I didn't memorize the numbers, but I

17   think the guidelines number comes to about six or the range

18   is zero to six months.  He understands further that he will

19   have to submit to a presentence investigation and give

20   truthful testimony and -- or not testimony -- information to

21   the Court.  He understands further that the guideline range

22   is something the Court is obliged to consider but isn't

23   bound by; that the plea remains in effect even if the Court

24   disagrees with that number.  He understands further that

25   he's waiving certain, but not each and every, right to

1     appeal, depending on what happens at sentencing.  And there

2     is a -- I believe there's -- it also calls for a $500 fine,

3     and we've discussed that.

4              THE COURT:  Restitution.

5              MR. PATTIS:  The -- excuse me.  I'm sorry.  He

6     understands that that's not a number that the Court is

7     necessarily bound by -- as with everything else, it could be

8     less; it could be more -- and that if the Court reaches

9     conclusions different than our estimate, that is not a

10    condition sufficient for him to withdraw the plea.

11             THE COURT:  All right.  And I'll just -- we're

12    going to go over this.  I'll just also add, and as part of

13    the agreement, the Government is moving to dismiss his

14    Superior Court case --

15             MR. PATTIS:  Yes, I should -- that was --

16             THE COURT:  -- which --

17             MR. PATTIS:  -- would -- went without saying.  I

18    apologize.

19             THE COURT:  All right.  So I do agree that this --

20    and accept that this plea agreement is of the type

21    authorized by Federal Rule of Criminal Procedure 11(c)(1)(A)

22    insofar as it specifies that the Government will not bring

23    other charges for the conduct set forth in the factual basis

24    for plea, will dismiss the remaining counts of the

25    information at sentencing, and will dismiss the -- another

1    case against Mr. Shroyer that is currently pending in D.C.

2    Superior Court at the time of sentencing.

3          So Mr. Shroyer, let's talk about some of the

4    provisions in the agreement, and we'll start with the

5    potential sentence that you are exposed to.

6          First, do you understand that if I accept your

7    guilty plea in this case, you could receive a maximum

8    sentence -- maximum sentence -- of one year imprisonment, a

9    term of supervised release of not more than one year, a fine

10   of not more than $10,000, and an obligation to pay any

11   applicable interest or penalties on fines and restitution

12   not timely made?  Do you understand all of that, sir?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Okay.  "Supervised release" means that

15   if you were sent to prison, then upon your release, you

16   would be under the supervision of the Probation Office and

17   expected to follow conditions and rules with which you would

18   have to comply.  If you violated any of those conditions,

19   you could be sent back to prison for an additional period of

20   time.  Do you understand that, sir?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  All right.  Do you understand that

23   you'll have to pay what's known as a special assessment of

24   $25 to the Clerk of the Court?

25         THE DEFENDANT:  Understood, Your Honor.

1          THE COURT:  All right.  And do you understand that

2     as part of the plea in this matter, you have agreed to pay

3     restitution to the Department of the Treasury in an amount

4     of $500?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Do you understand that?

7          All right.  So the -- next, we will talk about the

8     guidelines.

9          Have you and your attorney talked about the

10    advisory sentencing guidelines and how they apply to your

11    case?  That's the zero to six he mentioned a moment ago.

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Okay.  So although the --

14         MR. PATTIS:  As -- we referred to it as the

15    cookbook.

16         THE COURT:  Although the parties have estimated in

17    the plea agreement what they think your guidelines range is,

18    do you understand I'm not able to determine your guidelines

19    sentencing range until after what's known as a presentence

20    report has been completed and after you and your lawyer and

21    the Government, for that matter, have had an opportunity to

22    object to the facts and conclusions of the probation officer

23    that are in that report?  Do you understand that, sir?

24         THE DEFENDANT:  Understood, Your Honor.

25         THE COURT:  Okay.  And part of your guidelines

1    sentencing range calculation is your offense level.  Again,

2    the Government and your attorney have stated in the plea

3    agreement what they estimate your offense level to be.  The

4    parties have agreed that the base offense level is four, and

5    that by operation of a particular portion of the guidelines,

6    the offense level is increased by two to six; however, the

7    Government agrees that you're entitled to a two-level

8    reduction if you accept responsibility for your actions,

9    adhere to the plea agreement, and display acceptable conduct

10   between now and sentencing.  So netting all of that out,

11   your guidelines offense level will be a four.  They also

12   estimate that you have two criminal history points which

13   places you in Criminal History Category II for the

14   sentencing guidelines.  So the recommended sentencing range

15   for an offense level of four and a criminal history category

16   of II is zero months to six months of imprisonment.  Do you

17   understand that?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  Okay.  There's a -- the guidelines

20   also apply to fines.  So the recommended fine for someone in

21   your -- with a -- for an offense level of four and a

22   criminal history category of II is between $500 and $9,500.

23   Do you understand that, as well?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Okay.  And do you understand that the

1    advisory guidelines sentence that is eventually calculated

2    may be either more severe or less severe than the parties

3    recommend -- that the parties estimate here today?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Okay.  Do you understand -- do you

6    also understand that after I've decided what guideline

7    applies to your case and what the advisory guideline range

8    is, that the guidelines are not binding on me and that I

9    have the authority, when I consider all the relevant

10   sentencing factors, to impose a sentence that is more severe

11   or less severe than the sentence recommended by the

12   guidelines?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Except, of course, I can never exceed

15   the statutory maximum of one year for the offense.

16             Do you understand that you cannot withdraw your

17   plea just because the sentence I end up imposing happens to

18   be more severe than the sentence recommended by the

19   guidelines or more severe than the parties may recommend or

20   request or more severe than you expect?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  All right.  Mr. Shroyer, let me give

23   you a preview of the factors I will have to take into

24   account in determining your sentence.

25             In addition to the sentencing guidelines, which we

1    have already discussed, I have to consider a whole bunch of

2    other things.  Those include the nature and circumstances of

3    the offense; your particular history and characteristics.  I

4    have to consider whether the sentence serves the purposes of

5    criminal sentencing; that is, whether it reflects the

6    seriousness of the offense and provides just punishment;

7    whether it deters you and others from engaging in criminal

8    conduct; whether it provides you with helpful treatment and

9    services that might be available.  I have to consider the

10   kinds of sentences available; the sentencing guidelines,

11   which we have discussed; and I have to ensure that the

12   sentence I give you is in line with sentences given to

13   similar defendants who have been found guilty of similar

14   conduct.  I also have to consider the need to provide

15   restitution to any victims of the offense.

16           Do you understand that I must consider all of

17   these factors in selecting a sentence for you, sir?

18           THE DEFENDANT:  I do, Your Honor.

19           THE COURT:  All right.  Finally, let's return to

20   the plea agreement a final time and talk for a moment about

21   the appeal provisions in the agreement.  You are giving up

22   all your rights to appeal, except for a few exceptions.

23           Do you understand that by pleading guilty, you are

24   giving up all rights to appeal your conviction in this

25   case -- your conviction -- except on the basis of

1    ineffective assistance of counsel or if there was some

2    fundamental defect in our proceedings that was not waived by

3    your guilty plea?  Do you understand that?

4             THE DEFENDANT:  Yes, Your Honor.

5             THE COURT:  And do you understand you're also

6    giving up your right to appeal the sentence I impose except

7    to the extent I sentence you above the statutory maximum --

8    that would be an illegal sentence -- or the guidelines range

9    that I determine or if you assert that you received

10   ineffective assistance of counsel, again, in which case,

11   your right to appeal would be limited to those issues?  Do

12   you understand that?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  Okay.  And do you also understand that

15   under the plea agreement, you are also giving up the right

16   to what's known as collaterally challenge the conviction or

17   sentence except in some very limited situations to the

18   extent that the challenge is based on newly-discovered

19   evidence or, once again, on a claim that you received

20   ineffective assistance of counsel?  Do you understand that,

21   sir?

22            THE DEFENDANT:  Yes, Your Honor.

23            THE COURT:  All right.  Mr. Shroyer, that is

24   all -- a summary of the terms of your plea agreement.

25            Do both counsel agree that I've accurately stated

1    the terms of the agreement?

2         Mr. Pattis?

3         MR. PATTIS:  I do, sir.

4         THE COURT:  Mr. Edwards?

5         MR. EDWARDS:  Yes, Your Honor.

6         THE COURT:  All right.  Mr. Shroyer, is all of

7    that what you agreed to?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  And are you completely satisfied with

10   the service of your lawyer in this case?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  Have you had enough time to talk with

13   him and discuss the case, the charges, the plea offer, and

14   whether or not you should accept it?

15        THE DEFENDANT:  I have, Your Honor.

16        THE COURT:  All right.  Mr. Shroyer, has anyone

17   forced, threatened, or coerced you in any way into pleading

18   guilty?

19        THE DEFENDANT:  No, Your Honor.

20        THE COURT:  Has anyone made any promises to you in

21   connection with your guilty plea other than those contained

22   in the plea agreement or that we've discussed in open court

23   here?

24        THE DEFENDANT:  No, Your Honor.

25        THE COURT:  Other than, again, what is in the plea

```
1    agreement letter or what we've stated in open court here,

2    has anyone made any promises to you about what sentence I

3    will impose in this case if I accept your guilty plea?

4              THE DEFENDANT:  No, Your Honor.

5              THE COURT:  Are you entering this plea of guilty

6    voluntarily and of your own free will and because you are,

7    in fact, guilty, sir?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Is there anything you don't understand

10   about our proceeding today or your plea in this case?

11             THE DEFENDANT:  No, Your Honor.

12             THE COURT:  Is there anything you want to ask me

13   or your lawyer about before you enter your plea?

14             MR. PATTIS:  It's up to you.

15             THE DEFENDANT:  No.

16             MR. PATTIS:  May I have a moment?

17             THE COURT:  Yeah.

18             (Brief pause.)

19             THE DEFENDANT:  No, I feel comfortable at this

20   time, Your Honor.

21             THE COURT:  All right.  Mr. Shroyer, what is your

22   plea to Count 1 of the information, entering and remaining

23   in a restricted building or grounds, in violation of 18

24   United States Code Section 1752(a)(1), guilty or not guilty?

25             THE DEFENDANT:  Guilty, Your Honor.
```

27

 1          THE COURT:  All right.  I do find that the

 2   defendant is fully competent and capable of entering an

 3   informed plea, that he understands the nature of the charges

 4   and the consequences of the plea, that the plea of guilty is

 5   knowing and voluntary, and that he's acting of his own free

 6   will in pleading guilty, and that there is an adequate

 7   factual basis containing each of the essential elements of

 8   the offense; therefore, I do accept the plea and the

 9   defendant is now adjudged guilty of Count 1 of the

10   information.

11          You may return to your seat, sir.

12          All right.  Ms. Harris, do you have a suggested

13   sentencing date?

14          THE DEPUTY CLERK:  Tuesday, September 12th.

15          THE COURT:  How does Tuesday, September 12th at

16   10:00 o'clock work for the parties?

17          MR. PATTIS:  No objection, Judge.

18          (Brief pause.)

19          MR. EDWARDS:  Works for the Government, Your

20   Honor.

21          THE COURT:  All right.  So we'll set things down

22   for then, Tuesday, September 12th, at 10:00 o'clock.  I will

23   ask the parties to file sentencing memoranda one week

24   beforehand which would be September 5th.  Let me ask -- I

25   mean, in most cases -- well, let me ask this.  Do the

1   parties think there is any reason for me to stagger the

2   submission of those sentencing memoranda from either side's

3   perspective?

4          MR. PATTIS:  Defense does not.

5          MR. EDWARDS:  Not from the Government.

6          THE COURT:  Okay.  So we'll make those due

7   September 5th, one week beforehand.

8          Mr. Shroyer, let me tell you a little bit about

9   how sentencing will work, sir.  A written presentence report

10  gets prepared by the Probation Office to assist me in

11  sentencing.  It's a lot -- just a lot of information about

12  you to help me craft a sentence for you.  You'll be asked to

13  give information to the presentence report writer.

14  Mr. Pattis may be present, if you would like, when you give

15  that information, and you and your lawyer will have an

16  opportunity to read that report and to object to portions of

17  it, if you think some of it's inaccurate, and give that

18  objection to the Probation Office before I even see it.

19  You'll also, obviously, have the opportunity to speak with

20  me, if you so choose, at your sentencing hearing and, of

21  course, your lawyer will have the opportunity to address me

22  then.

23         Is -- I didn't see it in the agreement.  But

24  what's the Government's position on Mr. Shroyer's conditions

25  of release?

1        MR. EDWARDS:  Part -- as part of the plea

2    agreement, Your Honor, the Government agreed that we

3    wouldn't seek any change in his status.  I believe it's on

4    Page 3 -- 5, Paragraph 9.

5        THE COURT:  I would have -- yep, I would have

6    thought that would have been the case.

7        Mr. Shroyer, so you'll be continued on your -- the

8    conditions of release you've been on so far in this case.

9    It's certainly, as it has been up until now, in your best

10   interests to continue to abide by those conditions of

11   release between now and September 12th and we will go from

12   there at sentencing.

13       Is there anything else that counsel thinks we need

14   to address here today?

15       MR. PATTIS:  Only one thing, Judge.  Mr. Shroyer

16   resides in Austin.  Is it possible to arrange a presentence

17   investigation either through someone in the Austin office or

18   to do it telephonically so that he doesn't have to return

19   here for this?

20       THE COURT:  Oh, I think it's routinely done

21   telephonically.

22       MR. PATTIS:  It may be -- not for -- I'm aware of

23   incarcerated cases -- that may be just the incarcerated --

24       THE COURT:  Oh.

25       MR. PATTIS:  -- case where you have to show up,

```
1    but if it's done telephonically, that's fine.

2              THE COURT:  I think that's right.

3              What's the Government's view of this?

4              MR. EDWARDS:  I think that's right, Your Honor.

5    I -- and regardless, the Government wouldn't oppose, not

6    that we have leverage here, but we don't oppose if that

7    interview's done telephonically or virtually.  We just defer

8    to Probation and how they handle that.

9              THE COURT:  Yeah.

10             I mean, let me put it this way, Mr. Pattis --

11   because I don't think we have anybody from Probation here

12   today -- but if that's an issue, you know where to find me.

13             MR. PATTIS:  Yes, sir.

14             THE COURT:  I would be -- I don't think there's

15   any reason for him to travel halfway across the country for

16   that interview, but you all can let me know if that's an

17   issue.

18             MR. PATTIS:  Yes, sir.

19             THE COURT:  All right.  If there's nothing

20   further, then, I will see the parties back here on September

21   12th.  And the parties -- oh, hold on one second.  Let me

22   just make sure.  Ms. Harris has a ball she needs -- and

23   until then, the parties are dismissed.

24             MR. EDWARDS:  Thank you, Your Honor.

25             THE DEPUTY CLERK:  All rise.  This Honorable Court
```

1    stands in recess.

2              (Proceedings concluded at 10:36 a.m.)

3                  * * * * * * * * * * * *

4          CERTIFICATE OF OFFICIAL COURT REPORTER

5    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

6    that the above and foregoing constitutes a true and accurate

7    transcript of my stenographic notes and is a full, true and

8    complete transcript of the proceedings to the best of my

9    ability, dated this 3rd day of October 2023.

10                         /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
11                         United States Courthouse
                           Room 6722
12                         333 Constitution Avenue, NW
                           Washington, DC 20001

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          CR No. 1:21-cr-00542-TJK-1

v.                              Washington, D.C.
                                 Tuesday, September 12, 2023

JONATHON OWEN SHROYER,       10:00 a.m.

                   Defendant.

- - - - - - - - - - - - - - - - - -x

_____

TRANSCRIPT OF SENTENCING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the United States:    Kimberly L. Paschall, Esq.
                        Troy A. Edwards, Jr., Esq.
                        U.S. ATTORNEY'S OFFICE
                        555 Fourth Street, NW
                        Washington, DC 20530
                        (202) 252-2650

For the Defendant:        Norman A. Pattis, Esq.
                        PATTIS & SMITH, LLC
                        383 Orange Street
                        1st Floor
                        New Haven, CT 06511
                        (203) 393-3017

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                        Official Court Reporter
                        U.S. Courthouse, Room 6722
                        333 Constitution Avenue, NW
                        Washington, DC 20001
                        (202) 354-3111

Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.

<u>**P R O C E E D I N G S**</u>

1

2      THE DEPUTY CLERK:  This is Criminal Matter 21-542,

3  United States of America v. Jonathon Owen Shroyer.

4      Present for the Government are Kimberly Paschall

5  and Troy Edwards; present from the United States Probation

6  Office is Aidee Gavito; present for the defendant is Norman

7  Pattis; also present is the defendant, Mr. Shroyer.

8      THE COURT:  All right.  Good morning to everyone.

9      Is there anything preliminary before we begin from

10 the Government first?

11     MS. PASCHALL:  Not for the Government, Your Honor.

12     THE COURT:  All right.  From the defense?

13     MR. PATTIS:  No, sir.

14     THE COURT:  All right.  I -- we are, obviously,

15 here for the sentencing for Mr. Shroyer.  I have reviewed

16 everything, I think, pertinent on the docket which is the

17 presentence report and the sentencing recommendation from

18 the Probation Office -- those are ECFs 44 and 45 -- the

19 sentencing memoranda from the Government and the defendant

20 and the defendant's reply -- that's 46, 48, and 49 on the

21 docket -- as well as all the videos the Government has

22 provided.

23     Are there any other documents or materials for me

24 to review?

25     MR. PATTIS:  Judge, I'd like the record to reflect

```
1    I sent a note to chambers about submissions in this case.

2    The submissions that you have mentioned are the submissions

3    we rely on.  I have not read other submissions that may or

4    may not have found their way to you.

5              THE COURT:  They have not.  If I have not

6    mentioned them, I have not -- they have not made their way

7    to me and I have not reviewed them.

8              MR. PATTIS:  Thank you, sir.

9              THE COURT:  All right.  Anything else from the

10   Government?

11             MS. PASCHALL:  No, Your Honor.

12             THE COURT:  All right.  That has been a -- in some

13   cases, certainly, an issue that folks from the public think

14   they should have a say in a criminal case when they haven't

15   been invited to by either side.  I don't know if that's the

16   case here, but in any event I -- whatever that reference --

17   you've referenced, I have not seen.

18             Mr. Shroyer, our sentencing hearing today --

19   actually, before I do that, let me just make sure -- well,

20   we'll get to that in a moment.

21             Mr. Shroyer, our sentencing hearing today will

22   proceed -- you can have a seat, sir.  You can have a seat.

23             Our sentencing hear today will proceed in four

24   steps.  And all the while, I want you to keep in mind the

25   seriousness of why we are here.  You committed and pled
```

1   guilty to a federal crime, and today's hearing is about the

2   consequences that you'll face as a result of your decision

3   to commit that crime.

4         The first step of today's hearing is for me to

5   determine whether you have reviewed what's called the

6   presentence report and whether there are any outstanding

7   objections to that report and, if so, to resolve those

8   objections.

9         The second step is for me to determine what

10  sentencing guidelines and sentencing range applies in your

11  case based on your criminal history and considering any

12  mitigating or aggravating factors that might warrant a

13  departure under the sentencing guidelines manual.

14        The third step is for me to hear from the

15  Government, from your counsel, and from you if you wish to

16  be heard about sentencing in this case.

17        And the last step is for me to fashion a just and

18  fair sentence in light of the factors Congress has told me I

19  have to consider in 18 United States Code Section 3553(a),

20  and as part of that last step, I will actually impose the

21  sentence along with any other required consequences of the

22  offense.

23        So the presentence report in this case was

24  filed -- the final one -- on September 5th of 2023.  Does

25  the Government have any objection to any of the factual

1    statements set forth in that report?

2             MS. PASCHALL:  No, Your Honor.

3             THE COURT:  All right.  Let me turn to you,

4    Mr. Pattis.  Does the defendant have any objection to any of

5    the factual statements set forth in the report?

6             MR. PATTIS:  Yes, Judge --

7             THE COURT:  Mr. Pattis, can I just ask you to --

8    I'll give you two possibilities.  One is you may remain

9    seated -- you can move the microphone over and address me

10    that way -- or you can come to the podium.  Either way, I

11    need a microphone near your mouth.

12             MR. PATTIS:  Judge, we have filed objections.  I

13    don't know if they found their way to the Court.  I think

14    they were a day or two late.

15             THE COURT:  Well, they -- if they're part of the

16    presentence -- in other words, the presentence report

17    typically notes any outstanding objections -- the final

18    presentence report typically notes any objections that

19    remain outstanding after you've talked with them about them,

20    and this just says the defendant, through defense counsel,

21    filed clarifications of two paragraphs that have been

22    included.  So --

23             MR. PATTIS:  Okay.  That's --

24             THE COURT:  -- that sounds like there's no

25    outstanding objections.

6

```
1              MR. PATTIS:  Correct.  That is the case, sir.

2              THE COURT:  Okay.  All right.  Very well.

3              If you can, Mr. Pattis, slide the microphone to

4    Mr. Shroyer.  Let me just ask him a few things.

5              Mr. Shroyer, are you satisfied with your attorney,

6    Mr. Pattis, in this matter?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Okay.  And have you had enough time to

9    talk with him about both the presentence report and the

10   papers the Government has filed in connection with

11   sentencing?

12             THE DEFENDANT:  I have, Your Honor.

13             THE COURT:  All right.  And you're prepared to go

14   forward today?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Okay.  Again, you may be seated.

17             All right.  So I will accept the facts as stated

18   in the presentence report and the presentence report will be

19   my findings of fact for purposes of this sentencing.

20             Now, the next step is the guidelines.  First, let

21   me just lay out the, sort of, maximum under the law and how

22   the guidelines apply in this case and then I'll ask the

23   parties if they agree.  I don't think there's likely to be

24   any material disagreement here.

25             First, as a preliminary matter, Congress has
```

1    imposed a statutory maximum sentence for the offense to

2    which Mr. Shroyer has pled guilty.  The statutory maximum is

3    one year.  One year for this Class A misdemeanor.

4          As far as the sentencing guidelines go, the

5    guideline for the offense conduct charged is 2B2.3,

6    trespass.  So it is a four.  You add two for restricted

7    grounds.  You minus two for acceptance of responsibility.

8    So the final offense level is a four.  Mr. Shroyer has two

9    criminal history points.  So he is in Criminal History

10    Category II for the sentencing guidelines.  And thus, given

11    an offense level of four and a criminal history category of

12    II, the guidelines range is zero months to six months.

13          Are there any objections to this sentencing

14    guideline calculation?

15          MS. PASCHALL:  Not for the Government.

16          MR. PATTIS:  None, sir.

17          THE COURT:  All right.  Having determined the

18    applicable guidelines sentence, I usually have to consider

19    any departures from the guidelines.  I don't think -- I

20    think probably the plea agreement has committed both sides

21    to not asking for any departures.  So if that is -- let's

22    put it this way.  If that's not the case, you can -- someone

23    can let me know.  I'm going to assume for the moment, given

24    your silence, that it is the case.  So I will now discuss

25    the remaining applicable penalties in the case, given that

1    guideline calculation I just mentioned before, in terms of

2    supervised release, fines, and forfeiture.

3          Under the statute, I may -- as far as supervised

4    release goes, under the statute, I may impose a term of

5    supervised release of not more than one year.  That's 18

6    United States Code Section 3583(b)(2).  And the guidelines

7    range for a term of supervised release is one year, as well.

8    That's 5D1.2(a)(3).  Under the statute, the defendant is --

9    just make sure of one thing here.

10          (Brief pause.)

11          Hmm.  Under the statute, the defendant is eligible

12    for up to five years' probation.  And under the guidelines,

13    if probation is imposed, it should be for at least one year.

14          As far as fines go, the maximum fine under the

15    statute is $100,000.  Under the guidelines, the recommended

16    fine is between $500 and $9,500.

17          And the parties have agreed on restitution in the

18    amount of $500.

19          There is also a mandatory special assessment of

20    $25 under 18 United States Code Section 3013(a)(2)(A).

21          Have I accurately stated the statutory and

22    guidelines framework under which we are operating in regard

23    to this case from the Government?

24          MS. PASCHALL:  Yes, Your Honor.

25          THE COURT:  Mr. Pattis?

```
 1              MR. PATTIS:  Yes, sir.

 2              THE COURT:  Okay.  Now, we get to the heart of the

 3     matter, consideration of the statutory factors and

 4     Mr. Shroyer's opportunity to speak to me.

 5              I must now consider the relevant factors that

 6     Congress set out in 18 United States Code Section 3553(a)

 7     and ensure that I impose a sentence sufficient but not

 8     greater than necessary to comply with the purposes of

 9     sentencing.  These purposes include the need for the

10     sentence imposed to reflect the seriousness of the offense,

11     to promote respect for the law, and to provide just

12     punishment for the offense.  And the sentence should also

13     afford adequate deterrence to criminal conduct, protect the

14     public from future crimes of the defendant, and promote

15     rehabilitation.  And in addition to the guidelines and

16     policy statements, I must consider the nature and

17     circumstances of the offense; the history and

18     characteristics of the defendant; the need for the sentence

19     imposed to comply with the purposes I just mentioned; the

20     kinds of sentences available; the need to avoid unwanted

21     sentence disparities among defendants with similar records

22     who have been found guilty of similar conduct; and the need

23     to provide restitution to victims of the offense.

24              So let me hear from the Government on application

25     of the 3553(a) factors and to make a sentencing
```

1    recommendation.

2        MS. PASCHALL:   Thank you, Your Honor.

3        The Government recognizes it's a difficult thing

4    for the Court and the parties to grapple with a specific

5    defendant's culpability in the context of a larger event,

6    particularly this event which looms large over all of these

7    sentencings but does not tell the whole story, nor does it

8    tell the specific story of this defendant.  The Government,

9    by its allocution today, does not intend to attribute the

10   events of January 6th to this particular defendant.  And

11   fortunately, we have the 3553(a) factors to consider in our

12   analysis with this specific defendant.

13       That being said, we cannot ignore the impact of

14   that event as a whole as we consider what is an appropriate

15   sentence here, the impact on the officers who were present

16   that day, the lawmakers who were there to do their job, and

17   the institutions of our government that now hang more

18   precariously in the balance than they did previously.  Your

19   Honor has noted in past sentencings that the damage done

20   that day was both tangible and intangible.  We will be

21   talking more about the second here.  And as Judge

22   Kollar-Kotelly has previously noted, every drop adds to the

23   flood.  Every person who was illegally there that day plays

24   a part.  Every defendant added to the overwhelming effect of

25   what is now this black mark in our nation's history.

```
 1              I want to first address some things that were

 2    raised in the supplemental memo before turning to the

 3    Government's specific recommendations.  And I'll start with

 4    the First Amendment arguments.  Your Honor has very recently

 5    addressed this in the sentencing of United States v.

 6    Nordean, et al.  It's not a completely frivolous argument.

 7    The safeguards of the First Amendment are incredibly

 8    important.  But as you've repeated there, the argument that

 9    because speech is neither incitement or a threat means that

10    it's completely protected, it has no basis in the law.

11              THE COURT:  So let me just push back on that just

12    a little bit.  I'm pushing back on my own quote.  So take

13    that of -- what you will.

14              What -- the issue in that case was -- I think it

15    was differently positioned in [sic] a couple of reasons.

16    And Mr. Pattis knows we had many a conversation about this

17    during that case.  And throughout, given the types of

18    charges at issue, I thought there was no doubt that

19    statements -- that someone's statements protected under the

20    First Amendment -- that someone could not be put in jail

21    or prosecuted for those statements -- that those statements

22    can be evidence at a trial.  Of course, we didn't have a

23    trial here.  But even the charge to which Mr. Shroyer has

24    pled guilty doesn't have the kind of intent elements that

25    the statutes at issue in that case had.  And so I mean,
```

1    obviously, we're not talking -- these are separate questions

2    about what I can consider at sentencing and what is -- what

3    might be admissible evidence at a trial.  And I think, look,

4    the Government cited a lot of cases that by and large, at

5    sentencing, in theory, I can consider just about anything.

6    I -- it's really a question of what weight, it seems to me,

7    to give whatever you're arguing to me.  And I just think --

8    I mean, I think that a statement that -- let's just say --

9    that the election was stolen, I, you know -- that could be

10   admissible evidence in a trial to show motive or intent to,

11   then, do some -- if it linked up with the mens rea that the

12   Government had to prove, but when -- it seems to me it's

13   further afield when we're talking about a trespass offense

14   and, as Mr. Pattis says, Mr. Shroyer or any American has the

15   right to believe and say things that -- against all

16   evidence.  Let's put it that way.  They have that right.

17          So I don't know how much -- I feel a little

18   differently about statements that are made the closer we get

19   to the event.  And, certainly, when we're talking about

20   amping up the -- I think there's been many, many January 6th

21   cases in which judges have said, "Look, I find an

22   aggravating factor the fact that someone was out there

23   amping up the crowd."  I -- and I agree.  Like, I don't

24   think -- whatever someone has said, someone amping up the

25   crowd while on the steps of the Capitol, I think, is fair

1    game.  I just don't know how much, really, weight to give a

2    statement made a month before or whatever that -- or I

3    shouldn't say I don't know how much weight to give it -- my

4    inclination is to give it little to no weight that someone

5    postured like Mr. Shroyer is in a situation where he's pled

6    to what is essentially a trespass offense a month before

7    saying, in summary, "I think the election was stolen" --

8    "I" -- or "I" -- whatever along those lines.  I just -- I'm

9    uncomfortable giving much weight to that.

10           MS. PASCHALL:  So several things.

11           First, with respect to the weight on evidence of

12   the trespassing charge, I tend to agree; however, it would

13   be a mistake, as I mentioned, to extract a trespassing

14   charge from the entirety of Jan. 6th.

15           THE COURT:  Agreed.

16           MS. PASCHALL:  And so his statements with respect

17   to what was happening on that day should be relevant for

18   Your Honor's consideration.

19           Second, we draw your attention to those statements

20   because of how heavily they bear on the 3553(a) factors.

21   This defendant is unique in many ways.  Primary among that,

22   he already had a pending charge for this exact behavior.  If

23   Your Honor is meant to deter future crimes of this type from

24   the defendant, we need to look at what his motivations and

25   intents were for coming here to commit that crime in the

1   first place.  Those statements evince a depth of concern for

2   the Government because of how regular they are and how many

3   people heard them.  Your Honor has probably had many people

4   who have come before you in these January 6th cases and said

5   something to the effect of, "I was repeating what I heard on

6   the Internet.  I got swept up in the crowd.  I didn't know

7   what I was doing."  That isn't the case here because of

8   those statements.  It's abundantly clear that this defendant

9   is intelligent, he's paying attention, and he knows what

10  he's doing, and that's what's concerning to the Government.

11  In other cases, we have asked for the court to look at an

12  aggravating factor of giving interviews post hoc because of

13  the spread of disinformation about what happened on that day

14  and the concerns for general deterrence if information is

15  getting out there that appears to be saying that these

16  things are appropriate, they are okay, praising the events

17  of that day.

18          THE COURT:  Okay.  And that's a -- and then that's

19  a distinction -- I would just say, I agree with you that to

20  the extent someone is saying -- someone is before me for

21  committing a crime, and afterward, they say, "I would commit

22  that crime again; that crime was great," no question, that's

23  fair game and goes to their remorse.  I would also say even

24  a statement of overall what happened that day in -- January

25  6th, Congress being overrun and the proceedings being halted

1    by violence and the threat of violence, yeah, I think that's

2    also fair game in terms of thinking about remorse --

3    about -- for the overall event, but I just -- I make a

4    distinction, again, between someone saying anything along

5    those lines and someone saying -- again, it's not before me.

6    I'm not going to -- I'm not adjudicating the question of

7    whether the election was stolen here.  Many other courts did

8    that.  Put it that way.  But my point is someone saying

9    after the fact, "I still think the election was stolen,"

10   look, it's an unfortunate thing.  I'm not arguing with you.

11   But I don't -- I -- to me, that kind of statement, I'm just

12   not going to give -- I'm not going to give a whole heck of a

13   lot of weight to it, if any weight to it, in this or any

14   sentencing because I just think -- I mean, I -- this is one

15   area where I think I agree with Mr. Pattis.  If we're not

16   talking about violence, we're not talking about a crime --

17            MR. PATTIS:  May I order that piece of the

18   transcript on an expedited basis?

19            (Laughter.)

20            THE COURT:  I do think people have that right

21   and -- more so than I have that right -- let me put it this

22   way.  I don't think there's anything -- unmarried to

23   violence, there's nothing particularly even aggravating

24   about that.  It's un- -- again, I would -- my -- from where

25   I sit, it's an unfortunate thing, but I just -- I feel a

1    little uncomfortable weighing that very heavily.

2        MS. PASCHALL:  And I take Your Honor's point with

3    respect to any statements about the stolen election, but if

4    we excise that statement that concerns Your Honor from the

5    rest of the statements that the Government has submitted,

6    the rest of the statements should give Your Honor pause.

7    The statements leading up to the event concerning any calls

8    for revolution, for violence, anything about "death to

9    tyranny," chants of "1776," those are concerning.  And the

10   statements after the fact, bringing on other members of the

11   mob to glorify their actions, stating that we should be

12   proud of what happened that day, laying the blame for what

13   happened that day at the feet of Antifa, these are not his

14   opinions that can exist on their own and not affect Your

15   Honor's decision-making with respect to the 3553(a) factors.

16        And to be abundantly clear, the Government is not

17   in the business of convicting people for their beliefs.

18   This defendant is not sitting here because of who he voted

19   for, who he believes should be the leader of this country.

20   He's convicted for his actions on that day.  And any effect

21   that the defense feels the Government's memo might have on

22   the chilling nature of free speech is washed away by the

23   fact that he sits here for what he did, not what he said.

24        Judge Mehta put that much more eloquently than I

25   could in the Stewart Rhodes sentencing.  He said in this

1    country, we don't paint with a broad brush, and shame on you

2    if you do.  Shame on you if you want to convict somebody

3    because they supported the former president.  That doesn't

4    mean that they are a right-wing extremist or a criminal.

5    They voted for the other guy.  He voted for the other guy,

6    and he encouraged other people to do so, and he had civic

7    disagreements with those who did not.  That is a bedrock of

8    our democracy.  We want that here.  What we don't want is

9    what he sits convicted of.  We cannot have people who take

10    the law into their own hands, join into a mob, foment others

11    towards a revolution.  That's distinctly different than if

12    he had stayed at home and continued to express his views on

13    his Internet streaming show.

14        I want to turn to that for a minute as well,

15    because the defense supplement talks a lot about how he is a

16    journalist who has pled guilty to this crime.  The

17    Government is not in a position to debate the merits of

18    that.  But what we do know is that on January 6th, he is not

19    acting like a journalist.  A journalist gathers news,

20    reports on what they see.  A journalist does not make

21    themselves the story.  In fact, there were many journalists

22    who were there with press passes from the United States

23    Capitol Police.  They might carry videocameras, telephoto

24    lenses, audio recordings, microphones.  This defendant is

25    carrying none of that.  He's carrying a bullhorn and

1    screaming "1776" to a crowd of thousands of people on the

2    United States Capitol steps.  This does not a journalist

3    make.  So we believe that argument to be a complete red

4    herring.

5         I want to take a moment to focus on the effect of

6    Mr. Shroyer's crime.  He's not charged with destruction of

7    property or assault on a police officer.  Our sentencing

8    recommendation would have been significantly higher if he

9    had been.  But I don't want to discount the effect that each

10   individual had on the officers who were there that day doing

11   their duty and on the lawmakers who were present inside.  We

12   submitted to Your Honor and to defense counsel a portion of

13   testimony from Officer Carrion who testified in the Parker

14   case, and his testimony about the east front where this

15   defendant was located is particularly powerful because those

16   officers woke up that morning with the intention of doing

17   their jobs, to protect the building and the people inside of

18   it, and for that officer to say that by the end of his tour,

19   he was five men deep with hundreds of people in front of him

20   outmanned and could easily be overpowered speaks to what

21   this defendant did.  He is one of those numbers.  A mob does

22   not have any effect if it doesn't have numbers.

23        And his prior crime, sort of, speaks to that;

24   right?  Because he has been charged with another offense

25   that looks extremely similar to this one, but it doesn't

1   have the same effect.  One individual who comes and disrupts

2   Congress has perhaps committed a crime, but, maybe, not one

3   that makes national news; not one that causes the normal

4   functioning of the democracy to stop; not one that causes,

5   by estimation of Officer Daniel Hodges who spoke at the

6   Patrick McCaughey trial, at least 50 police officers in the

7   District of Columbia to leave their jobs in the months after

8   January 6th, 50 police officers who cite at least in some

9   part what the mob did to them that day -- not just the

10  people who assaulted them, damaged property; the mob -- what

11  those officers heard, what they understood to be happening,

12  a historic and terrifying event for those individuals just

13  because of the members of the mob who were yelling into

14  bullhorns like this defendant did.

15          Your Honor mentioned briefly about how his other

16  statements may play into his remorse, and we do want to

17  focus on that.  Your Honor addressed this in the Pruitt case

18  after that defendant made a statement.  And you noted that

19  he had time to reflect on what had happened that day and had

20  given interviews where he said that he had no regrets;

21  essentially, that he really had done nothing wrong.  That's

22  not dissimilar to what has happened here.  And you can

23  consider that in weighing the sentence.  You had hoped in

24  the Pruitt case that any defendant who would make a

25  statement would seek a complete disavowal of what he and the

20

1   mob had done.  And while we must credit the defendant for

2   acknowledging his guilt and accepting responsibility, that

3   is already baked into his guidelines calculation.  I hope

4   that Your Honor listens closely when defense counsel and if

5   the defendant chooses to speak for those type of statements

6   here to seek out whether there is a difference between the

7   technical acceptance of responsibility under the law or a

8   moral one so the Court can, then, feel comfortable and

9   assured that this defendant is not going to take part in

10  actions like this again because he fully accepts

11  responsibility.  That's one of the 3553(a) factors that

12  would give extra credit for remorse.

13          And finally, to talk a little bit about

14  deterrence, I've already noted this defendant was not

15  deterred by having one case for disruptive and disorderly

16  conduct at the Capitol.  He is probably the only January 6th

17  defendant who actually had a map where he knew he was not

18  supposed to be, and yet to continue that activity after he

19  already had one case, I think, is a strong factor for Your

20  Honor to consider in deterring this defendant from future

21  crimes.  Should he be granted leniency, who are we to say

22  that he might not think the third time is the charm and to

23  come back, once again, to commit crimes against this city?

24          And, of course, the general deterrence factor

25  weighs very heavily.  It does in all of our January 6th

21

```
 1    cases.  It's the consistent drumbeat Your Honor has heard
 2    from the Government over and over that we seek harsh
 3    sentences in these cases because we do not want anything
 4    like this to ever happen again from anybody, regardless of
 5    who they voted for, their creed, their ideology.  Nobody
 6    should come to this district, to this city, and to -- expect
 7    to see no ramifications when they commit crimes therein.
 8    The Justice Department does not stand by on those occasions,
 9    and we want that to be incredibly clear with our allocution
10    here.  So that's why we've asked for 120 days of
11    incarceration, 12 months of supervised release, and the
12    agreed-upon restitution.
13            Are there any other factors I can address for Your
14    Honor?
15            THE COURT:  No, I think you've hit them all.
16    Thank you, Ms. Paschall.
17            MS. PASCHALL:  Thank you.
18            THE COURT:  Mr. Pattis?
19            MR. PATTIS:  Good morning, again, Judge.  I think
20    this will be it for you and I on January 6th cases.  It's
21    been a long year, and thank you for your many courtesies.
22            I listened carefully to the Government's argument
23    and to your responses, and we are in a different posture, in
24    my view, than we were in the Proud Boys case.  As I took
25    your rulings and the remarks you made at sentencing, it --
```

1    they were as follows:  In that case, I argued that otherwise
2    protected speech ought not to count, as it were, to evaluate
3    an element of the offense; that is, the intent to engage in
4    seditious conspiracy.  The Court concluded that it should
5    and even said at sentencing in one of the cases -- and I
6    don't recall which -- there -- that may be an issue about
7    some standard that may or may not be applicable that isn't
8    in -- currently in the law.  If there's going to be one, I
9    guess it's going to be my responsibility or others'
10   responsibilities to create one on appeal.  I get that.  But
11   we're here not -- we're here not because this speech goes to
12   show an element of the crime, but we're here because of the
13   broad net that relevant offense conduct casts.  And I was
14   encouraged to hear the Court say that at least in some
15   instances, little or no weight would be attached to the
16   speech.
17          This is a case where Mr. Shroyer did appear on
18   January 6th.  He harbored -- and perhaps still harbors -- a
19   genuine belief that the election was stolen.  The Government
20   stands before you and says he didn't cause the events, but
21   their sentencing memo suggested otherwise.  And, candidly, I
22   was delighted by the sentencing memo.  It felt like a setup.
23   After all that you and I had gone through in the Proud Boys,
24   I now got a chance to argue -- reargue the case on a playing
25   field that was tilted, in my view at least, in my direction.

1          THE COURT:  More so.

2          MR. PATTIS:  More so, because I don't think it was

3     at all at least based on your rulings in the Proud Boys

4     case.

5          THE COURT:  Well, the facts are tough things.

6          MR. PATTIS:  They are, you know?  They -- and, you

7     know, we dealt -- that case is behind us and we're here on

8     this one.

9          The Government argued speech, but it ignored other

10     core First Amendment values; and that is, assembly, the

11     ability to petition for redress of grievances.  And there

12     was an assembly on January 6th at the Capitol, and

13     Mr. Shroyer did violate the DPA, and he'll address that in a

14     moment.  The Government seems to suggest in -- that -- it

15     seems to suggest his -- the notion that -- they seem to

16     ridicule the notion that he's a journalist.  The Court is

17     well aware there are no licensure requirements for

18     journalists in the United States.  That would be a prior

19     restraint.  It acknowledges that hundreds of thousands, if

20     not millions, of people listened to Mr. Shroyer every day,

21     as did 75 million listen to the president in the months

22     up -- leading up to January 6th, as did hundreds of

23     thousands on January 6th when he addressed a crowd at the

24     ellipse.

25          Mr. Shroyer went to the ellipse.  He went with a

1    group of people, including Individual 1 who we all know to

2    be Alex Jones.  They marched.  They had a permit to appear

3    in Zone 8 that day and to speak.  Mr. Shroyer violated -- he

4    entered Capitol grounds, and if he had it to do over again,

5    he wouldn't do it, and he'll tell you about that in a

6    moment, but he wasn't there to foment revolution.  He was

7    there to express his point of view and to cover an event

8    that is unique in our nation's history.  If it's a black

9    mark, it's becoming one because of the manner in which the

10   Justice Department has overreacted in this case.  And I had

11   harsh and tart words to say about the Government's

12   sentencing memoranda, and notwithstanding my regard for my

13   colleagues who have been nothing but polite and courteous to

14   me throughout, I stand by each and every one of them and

15   would stake my law license and my liberty as an American on

16   them.  We are a deeply divided country, these are hotly

17   contested times, and every single United States Supreme

18   Court case that I stand for recognizes the importance of

19   protecting vituperative and even violent speech.  Mere

20   abstract calls for violence at some future date are

21   protected.  Even advocating violence is protected.

22          If the Government seriously believed that

23   Mr. Shroyer was present on Capitol grounds on January 6th in

24   order to foment violence, they should have, and could have,

25   charged him with that, but they didn't.  Instead, they chose

25

1    their charges, and they chose their charges against a man

2    whom they regard as a repeat offender.  He did disrupt the

3    proceeding with Mr. Nadler who he thought was a criminal and

4    he thought should have been impeached for his treatment of

5    Donald Trump.  Tens of millions of Americans believed that.

6    And to my astonishment, given four indictments, he's still

7    running neck and neck and in some polls ahead of Joe Biden.

8    I don't know what the future holds, but that's not the

9    function of this Court at sentencing in this case.

10          Mr. Shroyer comes to you today to be sentenced

11   having accepted responsibility for what he did.  And I would

12   say, Judge, that among the most powerful mitigating factors

13   is his conduct in the course of the litigation.  I think you

14   know full well that had Mr. Shroyer wanted to fight it every

15   step of the way, I was fully capable of engaging in that

16   sort of hand-to-hand conduct [sic].  I sat in front of you

17   for four-and-a-half months in another case and did precisely

18   that, because that was what the client required in that

19   case.

20          In this instance, we waived an indictment.  The

21   Government called, suggesting that it might inure to

22   Mr. Shroyer's benefit if he were to turn over his phones

23   without a warrant.  I -- my initial reaction to that was, "I

24   don't know anything about the charges.  Let me see them."  I

25   looked at the charges and I thought, "Seriously?  Seriously?

1   This is what's going on in this country?"  And now, I've

2   learned, yeah, it is.  We evaluated the case.  We filed a

3   motion to dismiss here based on a claim --

4          THE COURT:  I -- Mr. Pattis, I've got to say right

5   there, I -- when you say, "Seriously, this is what's going

6   on in this country," I'm not sure -- are you -- I -- the

7   Government's entitled to investigate crimes.

8          MR. PATTIS:  No, I'm talking about the manner in

9   which these cases are being prosecuted.  I -- but you know

10  what, Judge?  I could not have foreseen that on the riot

11  that day, there would be 1,000 plus prosecutions.  I get it

12  now.  And in the course of evaluating the evidence and

13  seeing the weight that could be placed on the DPA,

14  Mr. Shroyer agreed that it -- a guilty plea was appropriate.

15         Okay.  And what's more, we turned over the cell

16  phones without a warrant.  And the Government took, I

17  believe, months -- there were several delays where we -- we

18  talked about -- we came before you and talked about doing

19  stuff.

20         THE COURT:  Yep.

21         MR. PATTIS:  And that was so the agents could pore

22  through his phone.  Then Mr. Shroyer, again, showed

23  extraordinary cooperation by sitting for a proffer in which

24  he waived his right to remain silent and to submit himself

25  to detailed questioning about the contents of his phone.  No

1    one has suggested he's been anything other than candid

2    there.  There was no adjustment for obstruction because he

3    gave a false statement to the FBI.  And the Court learned in

4    other cases how low the standard is for seeking that

5    obstruction-of-justice enhancement.  So I think you can

6    conclude that he was candid.  What the Government sought to

7    prove there is what they argue here, but they couldn't prove

8    it there and they shouldn't be permitted to argue it or you

9    shouldn't credit their arguments here.  Mr. Shroyer was not

10   part of a broader conspiracy to subvert the authority of the

11   United States Government.  He was a journalist with

12   opinions.  He came; he violated his DPA; he went where he

13   shouldn't have gone; he's pled guilty; and once he realized

14   that he had no defense, he cooperated with the Government,

15   giving them the information that was at his disposal, and

16   there's not a person in this room who can say it wasn't

17   truthful.

18          The suggestion that he ought to go to jail for

19   this is frightening to me because what it suggests is that

20   at the margins of every public event, there is the

21   possibility that a person's going to go to jail not for what

22   they did but because of what they said, and notwithstanding

23   the argument that the Government made here, the Government

24   does focus on these speech acts as aggravating factors, and

25   they have a right to do so arguably under relevant offense

1  characteristics, but if the First Amendment ever meant

2  something, I think it means something here, and it's similar

3  to acquitted offense conduct.  You're aware of the cert

4  petition where Judge -- that was just denied in this recent

5  term where the Court basically said to the Guidelines

6  Commission, "Do something about relevant offense --

7  acquitted offense conduct or we will."

8            THE COURT:  Yes.

9            MR. PATTIS:  And this is a First Amendment value.

10            THE COURT:  But let me just -- a couple things.

11  This is -- this has nothing to do with acquitted conduct.

12  It's -- nothing was -- there was no --

13            MR. PATTIS:  No, but it has to do with protected

14  speech which is just as vital.

15            THE COURT:  Okay.  But what do you make of the

16  idea -- I understand your argument as to a lot of the

17  statements that are more ancillary to the day.  Let's put it

18  that way.  But what do you make of the idea that it's an

19  aggravating factor that your client wasn't just present in

20  an unlawful place that day but he -- that he was present at

21  that place on the steps of the Capitol while this attack was

22  underway and he was leading the crowd in chants and amping

23  them up in that moment?  That's not --

24            MR. PATTIS:  The Government --

25            THE COURT:  That's not something I can properly --

```
1              MR. PATTIS:  When he was --

2              THE COURT:  -- consider?

3              MR. PATTIS:  -- on the steps of the Capitol, he

4    was standing next to Alex Jones who had a bullhorn and was

5    urging people to turn away from the Capitol so that the Left

6    wouldn't be given what they wanted which was ammunition to

7    prosecute them.  They talked to members of the -- the police

8    force on the Capitol steps, asked for permission to address

9    the crowd on the steps.  The Capitol Police officers

10   acquiesced in that.  I'm not going to go so far as to say

11   they gave consent.  That's an argument that others might

12   make.  I won't.  Mr. Shroyer wasn't on the Capitol saying,

13   "Go team, go team."  He stood silently by while the lead

14   personality in Infowars urged people to turn away.

15             THE COURT:  At one point, but at another point, he

16   did lead chants "USA, USA," and I don't remember whether it

17   was "17-" --

18             MR. PATTIS:  "Death to tyranny" -- right.

19             THE COURT:  Whatever it was.  But there -- he did

20   lead chants right on the steps; correct?

21             MR. PATTIS:  I'm not sure about that on the --

22   approaching the steps, he did.

23             THE COURT:  No, I mean on the steps.

24             MR. PATTIS:  Well, to chant "USA, USA" on the

25   steps, is that incitement?  What is that?
```

```
 1              THE COURT:  I'm not saying -- I, you know -- I
 2     know -- again, this is where -- I'm not saying it's
 3     incitement or not incitement.  I'm saying that the
 4     Government -- let me just be very clear where they say this,
 5     and I looked at the exhibit and it does appear to show it.
 6     I mean, the --
 7              MS. PASCHALL:  Your Honor --
 8              THE COURT:  It's Page --
 9              MS. PASCHALL:  -- I believe it's Government's
10     Exhibit No. 12 that was submitted.
11              THE COURT:  Right.  It's Exhibit-12 which is
12     referenced on Page 13 of their memorandum that Mr. Shroyer
13     is on the steps of the Capitol.  I think it was -- yeah --
14     "USA" and "1776."  I -- whatever.  The point is it's --
15     it -- he played a role in amping other people up, not
16     just -- not down the street; not two weeks before.  Like, on
17     the steps of the Capitol while this is going on.  That
18     doesn't -- look, no one is here saying, you know -- I
19     think --
20              MR. PATTIS:  Judge, jail --
21              THE COURT:  We're talking about the margins here,
22     but I can't imagine -- are you arguing to me that that's not
23     relevant?
24              MR. PATTIS:  If it is, it's marginally so.  I
25     mean, jail for "1776"?  That's King George II or III --
```

```
 1              THE COURT:  It --

 2              MR. PATTIS:  -- talking, not you.

 3              THE COURT:  It doesn't matter to me what -- I

 4    mean, I -- the point isn't, I think, the particulars, but

 5    the point of the -- what he said --

 6              MR. PATTIS:  I agree.  I mean, look, he -- it was

 7    an -- I mean, what he will tell you -- and I'll let him

 8    speak for himself, but I've reviewed what I think he's going

 9    to say and I think what he'll tell you is, look, if he had

10    to do it again, he'd do it differently.  He was caught up in

11    the moment, it was a historic event, and it corresponded

12    with his deeply-held views, but in the end when they got

13    there, they reached the conclusion that the events were way

14    out of control and that they needed to enlist the support of

15    that crowd.  And if you notice what he said, it was what --

16    prelude to what Mr. Jones was saying.  "Get away.  Go to the

17    other side.  There's an event on the other side.  Do not go

18    in here.  Do not give the Left what we [sic] want."

19              There's a reason Alex Jones -- "that they want" --

20    has not been prosecuted in this case, and that's precisely

21    that.  And Mr. Shroyer was there as an adjunct to Mr. Jones.

22    Is it a factor you should consider?  Yes.  Does it tip the

23    needle in favor of incarceration?  In our view, it does not.

24    In our view, that wouldn't promote respect for the law.

25    "Death to tyranny," "1776," I hope will always be cherished
```

1    mantras, cherished remarks, cherished phrases at every

2    protest in the United States because this is a country worth

3    fighting and dying for, and Mr. Shroyer certainly engaged in

4    that fight.

5         So I think, Judge, that our perspective is, you

6    know, I -- we would ask that the Court adopt the

7    recommendations of the probation officer.  I think that

8    that's a more sensible response.  Candidly, I was so

9    outraged by the sentencing memo, I wanted you to punish the

10   Government and just let him go home from here, saying,

11   "Knock it off, you guys," you know, but I don't hear you

12   doing that, but I think incarceration sends the wrong

13   message in this case.  I don't think that Mr. Shroyer is a

14   recidivist, is a criminal --

15        THE COURT:  Oh, he actually is a recidivist

16   literally because we've -- that's why probably we're even

17   here; right?  I mean, he's a recidivist because he got

18   arrested before for disrupting Congress and signed an

19   agreement, and now we're back here because he violated that

20   agreement.

21        MR. PATTIS:  Because he crossed the line.  He

22   crossed a geographic line.  He didn't enter the building.

23   He didn't encourage violence.  He engaged in no violence.

24   He committed trespass.

25        THE COURT:  All right.  Very well.

```
 1              MR. PATTIS:  So for all of those reasons, Judge,

 2      and, you know -- we would ask the Court to impose no

 3      incarceration.

 4              Mr. Shroyer would like to address you.  And if I

 5      may remain here with him while he does?

 6              THE COURT:  Yes, sir.

 7              Mr. Shroyer, you may approach.

 8              (Brief pause.)

 9              THE DEFENDANT:  Your Honor, first of all, I'd like

10      to thank this Court, the judge, and the prosecution for

11      their time and consideration to hear from me in what I know

12      has been a difficult time for everybody involved in this

13      case and the others.  I would like to thank the prosecution

14      for review of my personal effects to help their case and

15      their professionalism in the investigation.  It is my

16      understanding that we were all operating in good faith

17      throughout the process.

18              Now, the Government suggests I have no respect for

19      the law, and I would like to tell you that that is not the

20      case.  And, in fact, I have enormous support for law

21      enforcement.  I have a public track record of such support,

22      and I have used my platform multiple times to show my

23      support for law enforcement and even have pro-police rallies

24      when there were opposition rallies happening at the same

25      time.
```

1           I think that I further demonstrated my support for
2    law enforcement by waiving my indictment and voluntarily
3    turning over my personal effects without any warrant.  I was
4    also on probation in this case for more than two years and
5    have been on good behavior as is recognized by my Pretrial
6    Services officers.  I never missed a court date throughout
7    this process and, as you know, there were many.  I sat for a
8    proffer with the Government and was fully transparent and
9    honest.  I'm glad I did show -- I'm glad I did so to show
10    that I was not part of any larger plan for illegal activity
11    or violence that day.

12           On the issue of remorse, to be clear, had I known
13    the events of that day would have gone the way they did, I
14    not only would have reconsidered my activities and speech
15    for that day, but I certainly would have postured myself and
16    my platform in opposition to how the events of that day
17    ended up going down.

18           And if I may, to address the issues of the chants,
19    the reason why we engaged in that was an attempt to get the
20    attention of the crowd and draw them away.  It was not to
21    amp it up.  It was not to support the activities.  It was to
22    get the attention and draw the crowds away.

23           Your Honor, I pled guilty to the offense because I
24    was, and I own that.  I should have considered more to heart
25    what I was doing in D.C. that day and my probation, and I

1    should have sought permission to cover this event as a

2    journalist for my employer, but I didn't, and for that I am

3    responsible.  Your Honor, I ask that you consider my good

4    behavior and my role as a journalist in your final decision

5    in this case.

6            That is all, Your Honor.  Thank you.

7            MR. PATTIS:  Judge, there's one area that I forgot

8    to mention.  May I?  I know it's unusual.

9            THE COURT:  Yeah, it's okay.

10           MR. PATTIS:  With respect to the community service

11   requirement, Mr. Shroyer, on the 5th, through counsel, did

12   provide to the Government a list of his service and I

13   request that the DPA be honored and dismissed.  This was

14   after January 6th.  The Government notified us while there's

15   an open investigation, "We will not be dismissing.  And, oh,

16   by the way, it was supposed to be 32 hours."  Mr. Shroyer's

17   response was not to say, "Well, never mind," but he went out

18   and did a couple more hours and he -- we never submitted the

19   form because if the Government wasn't going to dismiss, you

20   know, what's the point?  But I mean, I think that goes to

21   his respect for the law.  And I can tell you that in the

22   course of these proceedings, which has been very difficult

23   because emotions are very high in Mr. Shroyer's world,

24   Mr. Shroyer has been an outlier in every respect.  He is

25   respectful of the law, and I would ask you to take in --

1     that into account in imposition of the sentence.

2          THE COURT:  All right.  You know, I think your

3     overall clarification that he had done those hours was

4     important.  I think the Government had indicated, as I

5     recall, that he hadn't or he hadn't completed them or I

6     can't recall, but something along those lines.

7          Does the Government want to make any statement in

8     response to Mr. Pattis's final comments and Mr. Shroyer's

9     allocution?

10          (Brief pause.)

11          MS. PASCHALL:  Your Honor, I don't think there's

12     much to add here.

13          With respect to the First Amendment issues, Your

14     Honor is well capable of addressing those.  I think, you

15     know, Your Honor's concerns about what was said on that day

16     are entirely appropriate.  I understand the defense point of

17     view as to what, you know, he thought he was doing, but I

18     would also note -- and we see this throughout the videos --

19     he's a well-known individual particularly among this section

20     of the population.  What he does matters.  His words matter.

21     And so if it had really been their intent to move people to

22     a place where they were appropriately supposed to be, I

23     don't think the actions that we see on the videos reflect

24     that, and his ability to garner a following from the crowd

25     is something Your Honor should consider when thinking about

```
1    those words.

2              THE COURT:  All right.  Very well.  We'll take a

3    10-minute recess and I'll come back and impose sentence.

4              THE DEPUTY CLERK:  All rise.  This Court stands in

5    recess for 10 minutes.

6              (Brief recess taken.)

7              THE DEPUTY CLERK:  We're back on the record in

8    Criminal Matter 21-542, United States of America v. Jonathon

9    Owen Shroyer.

10             MS. PASCHALL:  Your Honor, I apologize.  If I

11   could just have one brief indulgence?  With respect to the

12   community service hours, I don't think there's a discrepancy

13   over the number of hours that Mr. Shroyer did.  We do have

14   documentation of that.  It's just that all of those hours

15   took place after January 6th.  I think that's where the

16   discrepancy lies.

17             THE COURT:  Okay.  Very well.  But he wasn't -- I

18   mean, the agreement was still in effect at that time.  So he

19   was perfectly entitled to do them at that point, but --

20             MS. PASCHALL:  Correct, Your Honor.

21             THE COURT:  All right.

22             MR. PATTIS:  I know you don't want to hear endless

23   tit for tat, but one of the reasons that it took so long to

24   do it is COVID and it was hard to find a place.

25             THE COURT:  I -- you didn't even have to say it,
```

1   but I definitely appreciated it.

2          All right.  I have assessed the particular facts

3   of this case in light of the relevant 33 -- 553(a) factors

4   and I now want to provide my thoughts for the record and for

5   you, Mr. Shroyer, about my considerations in regard to the

6   nature of the offense, your history and characteristics, and

7   the other things I have to consider.

8          Let's -- we'll first start as far as the nature of

9   the offense goes.  And this is, in some respects, the

10  hardest thing my colleagues and I have to grapple with in

11  these cases, the fact that we have to consider the entirety

12  of the event, but -- to some degree -- but also consider you

13  and what -- and your involvement in the event.  Your role --

14  well, we'll get to that.

15         What happened that day was, in some ways, as

16  serious an event as there can be, given that it threatened

17  the peaceful transfer of power from one president to

18  another.  Your role was not the serious -- most serious of

19  those that day.  That's for sure.  And we'll get to that.

20  But the overall events of January 6th insofar as I have to

21  consider the nature and circumstances of the offense were

22  quite serious.  Mr. Shroyer, our Constitution and our laws

23  preserve for you rights that people in other countries would

24  do just anything -- just about anything for and that many of

25  our -- Americans who came before us fought and died for.

1    You have the right to vote for whoever you want for

2    president and, as you know, you have the First Amendment

3    right to speak out in favor of your candidate, to go on TV,

4    radio, the Internet, whatever you would like, and to try to

5    convince all your listeners or followers to vote for that

6    person.  If you don't like how an event is being conducted,

7    you can speak about that, too.  You can call or write or try

8    to meet with elected officials.  You can try to get election

9    laws changed.  You can engage in peaceful, lawful protest.

10    And you can even file a lawsuit in this court or in state

11    courts across the country.  That's why our courts are here.

12        But freedom means with those rights come

13    responsibilities.  And so what you cannot do is become part

14    of a mob that used violence and the threat of violence to

15    disrupt Congress's ability to fulfill its role that day to

16    process the certification of the Electoral College vote for

17    president.  And one way or another, that is what you ended

18    up doing.  There's nothing patriotic about it no matter how

19    much we don't like the process of electing our president is

20    proceeding.  Every four years, about half the country is --

21    doesn't like the outcome and the losers don't have the

22    right -- even if they think they weren't the losers, they

23    don't have the right to resort to violence or the threat of

24    violence.

25        So what happened that day was really a serious

1    blow against -- a blow against the customs and practices

2    that help support the rule of law and the Constitution.  We

3    had -- I've said a bunch of times, we've had -- we had in

4    this country until that day a tradition -- an unbroken

5    tradition of the peaceful transfer of power, but we don't --

6    that tradition has been broken and it's going to take some

7    time and effort to try to get it back.

8            So let's talk about your role.  Obviously, both

9    sides agree, your role was not -- well, the Government may

10   argue that some of your speech beforehand fomented things

11   that day, but as far as your role that day, it was limited.

12   You didn't bring any weapons.  You weren't, as you said, a

13   part of some sort of organized effort to physically -- to

14   take on the Capitol Police and to violently interrupt what

15   had happened -- what -- to violently interrupt Congress.

16   You didn't even go inside the Capitol.  But there are two

17   things that separate you from just somebody who was --

18   separate you from somebody who might happen to have been

19   past the barricades toward the Capitol that day and -- but

20   did not go inside.  And those two things are that you -- in

21   doing so, you violated a deferred prosecution agreement you

22   had reached with the Government for engaging in unlawful

23   conduct at the Capitol once before, number one.  And, number

24   two, you did play a role -- during the break, I went back

25   and watched the video of it -- in amping up the crowd right

1    outside the Capitol on the Capitol steps by chanting -- I

2    think it was "1776," but it doesn't -- the point -- and

3    there's nothing wrong -- the context is everything.  There's

4    nothing wrong with the phrase "1776."  And it really

5    wouldn't that much had -- matter to me what you did chant,

6    but I -- you did play a role at that moment in amping up the

7    crowd with a bullhorn, and I don't believe that you were

8    trying to distract the crowd or turn the crowd away from the

9    Capitol.  That's just not what that exhibit showed.  So

10   that's your -- that's the nature of the offense in terms of

11   your role.

12        Your characteristics as an offender.  You're a

13   college graduate, host of a show on the Internet, a

14   journalist, although your status as a journalist doesn't --

15   I -- let's put it this way.  It doesn't have -- it doesn't

16   play any role in my evaluation of things here, because I

17   think nothing that you're being prosecuted for and nothing

18   about your conduct that day really has much to do with your

19   being a journalist.  You had two misdemeanors from 2010, and

20   then we've already indicated this issue about the deferred

21   prosecution agreement and the conduct that you had in

22   committing unlawful conduct at the Capitol once before.

23        I also have to craft a sentence that reflects the

24   seriousness of the offense but also promotes respect for the

25   law and provides just punishment for the offense.  And it

1    also has to afford adequate deterrence, both general and

2    specific, you know?  I heard -- I listened to you speak

3    before about your respect for law enforcement, and I think

4    it's great that you have a respect for law enforcement, but

5    respect for law enforcement is not exactly respect for the

6    law.  Those are slightly different things.  Again, people

7    who are in law enforcement deserve our respect in general,

8    but respect for the law is something slightly different.

9    It's not bound up in anybody who has -- what anyone is

10   telling you in terms of somebody who has a badge and a gun,

11   but it's abiding by the law.  And here, we do have a

12   situation where, again, I think you were given one chance by

13   the Government to end up without a criminal conviction.  At

14   least that's the way deferred prosecution agreements usually

15   work if you had not violated it.  But I think it does show a

16   lack of respect for the law that you weren't able to abide

17   by that agreement.

18             And then we get to deterrence.  And, again, as the

19   Government indicated, this is -- you are probably unique in

20   January 6th defendants insofar as you had a map and insofar

21   as you were on this -- a deferred prosecution agreement for

22   unlawful -- alleged unlawful conduct at the Capitol.  And so

23   I do have to consider both specific -- general deterrence in

24   all these cases is important, but I do think there is an

25   issue of specific deterrence here because I don't think --

1    because you were given a chance.  You were given a chance,

2    and you decided to violate that agreement.

3          The Government wants 120 -- I have to consider --

4    I also have to consider the types of sentences available.

5    The Government wants 120 days.  Probation recommends

6    probation.  You are asking for probation.

7          There are -- and I have to consider unwanted

8    sentence disparities as well and the need to provide

9    restitution.  I can tell you I've looked.  If a judge really

10   wants to knock themselves out, I've looked at a lot of

11   January 6th defendants' sentences that have been handed out

12   for this crime for, you know -- you do stand out as a --

13   kind of, a unique case because of the deferred prosecution

14   agreement.  And so I have to weigh that and try to figure

15   out what -- where I think you fit into the overall hierarchy

16   of the day.  My -- but I do weigh strongly the fact that you

17   were given this opportunity and ultimately violated the

18   agreement and didn't take advantage of it.

19          So if I can ask, Mr. Pattis, you and Mr. Shroyer

20   to please approach the podium.

21          All right.  So after considering all the 3553(a)

22   factors and considering what is sufficient but not necessary

23   to comply with the purposes of sentencing, I do believe the

24   Government's sentence is far beyond what is needed here, but

25   I do -- I am going to sentence Mr. Shroyer to 60 days of

1   incarceration, 12 months of supervised release, and $500 in

2   restitution.  My sentence is driven, really, by three things

3   that interact with the 3553(a) factors in various ways.  One

4   is, as we've mentioned, that Mr. Shroyer had already been

5   arrested for unlawful behavior at the Capitol and that he,

6   then, violated the terms of his DPA; number two, that

7   Mr. Shroyer was not merely a trespasser that day, although

8   that was the nature of what he pled guilty to, but that he

9   did play a role in amping up the crowd on the Capitol steps

10  by leading chants that day, and I think that's something I

11  can and should consider; and then, third, on the record

12  before me as a whole -- while I accept Mr. Shroyer's

13  acceptance of responsibility, he gets credit under the

14  guidelines for that, and all the rest, on the whole and on

15  the entire record before me, including some of the

16  statements the Government has brought to my attention, I'm

17  not sure that he has truly -- let's put it this way.  I'm

18  not sure that he has disavowed in general the -- what

19  happened on January 6th in a way for me to give him even

20  extra credit for remorse for those -- for the day's events.

21  So for those three reasons, that -- those are the three

22  things that drive my sentence.

23          So pursuant to the Sentencing Reform Act of 1984

24  and in consideration of the provisions of 18 United States

25  Code Section 3553 as well as the advisory sentencing

1    guidelines, it's the judgment of the Court that you,

2    Jonathon Owen Shroyer, are hereby committed to the custody

3    of the Bureau of Prisons for a period of 60 days on Count 1.

4    You are further sentenced to serve a term of one year of

5    supervised release on Count 1.  In addition, you are ordered

6    to pay a special assessment of $20 [sic] in accordance with

7    18 United States Code 3013.

8         While on supervision, you shall abide by the

9    following mandatory conditions as well as all discretionary

10   conditions recommended by the Probation Office in Part D,

11   sentencing options, of the presentence report which are

12   imposed to establish the basic expectations for your conduct

13   while on supervision.

14        The mandatory conditions include, one, you must

15   not commit another federal, state, or local crime.

16        Two, you must not unlawfully possess a controlled

17   substance.

18        Three, you must refrain from any unlawful use of a

19   controlled substance.  You must submit to one drug test

20   within 15 days of placement on supervision and at least two

21   periodic drug tests thereafter as determined by the Court.

22        Firearm restriction.  You shall remove firearms,

23   destructive devices, and any other dangerous weapons from

24   areas over which you have access or control until the term

25   of supervision expired.

46

1          You are ordered to make restitution to the

2     Architect of the Capitol Building in the amount of $500.

3          I have determined you do not have the ability to

4     pay interest and, therefore, I waive any interest or

5     penalties that may accrue on the balance.

6          Restitution payments shall be made to the Clerk of

7     the Court for the United States District Court, District of

8     Columbia, for disbursement to the following victim:

9     Architect of the Capitol, Office of the Chief Financial

10    Officer, Ford House Office Building, Room H2-205B,

11    Washington, D.C. 20515.  The amount of loss is $500.

12         You must pay the balance of any restitution owed

13    at a rate of no less than $100 each month and provide

14    verification of same to the Probation Office.

15         The financial obligations are immediately payable

16    to the Clerk of the Court of the U.S. District Court, 333

17    Constitution Avenue, NW, Washington, D.C. 20001.  Within 30

18    days of any change of address, you shall notify the Clerk of

19    the Court of the change until such time as the financial

20    obligation is paid in full.

21         The Probation Office shall release the presentence

22    investigation report to all appropriate agencies which

23    includes the United States Probation Office in the approved

24    district of residence.  In order to execute the sentence of

25    the Court, treatment agencies shall return the presentence

1    report to the Probation Office upon the defendant's

2    completion or termination from treatment.

3           Mr. Shroyer, pursuant to 18 United States Code

4    3742, you have the right to appeal the sentence imposed by

5    me if the period of imprisonment is longer than the

6    statutory maximum or the sentence departs upward from the

7    applicable sentencing guideline range.  If you choose to

8    appeal, you must file any appeal within 14 days after I

9    enter judgment.

10          Under some -- you can also appeal your conviction

11   to the U.S. Court of Appeals for the D.C. Circuit if you

12   believe that your guilty plea was somehow unlawful or

13   involuntary or if there was some other fundamental defect in

14   the pleading -- in the proceedings that was not waived by

15   your plea agreement.

16          Pursuant to the D.C. Circuit's opinion, then, in

17   United States v. Hunter, 809 F.3d 677, are there any other

18   objections to the sentence that are not already noted on the

19   record?

20          MR. PATTIS:  Judge, as we would -- we will be

21   intending to take an appeal on the grounds of the

22   fundamental defect because of the Court's reference to

23   speech acts and we think that's inappropriate.  So I note

24   that for the record and in support of an application that he

25   remain at liberty under the conditions of supervised release

1    until such time as that appeal can be perfected.

2    THE COURT:  What's the Government's position on

3    that?

4    MS. PASCHALL:  Your Honor, we have no problem with

5    him remaining at liberty until the BOP would, you know, ask

6    for him to come and serve his sentence.  We would object to

7    him remaining at liberty through the pendency of an appeal.

8    I think we have pretty consistently taken that position.

9    And, second, it is not abundantly clear to me in

10    this moment -- though I would have to go back and look at

11    the plea agreement -- that that is a permissible grounds for

12    him to appeal.  Your Honor has not given an illegal

13    sentence, which is a permissible grounds for appeal, but I'm

14    not certain that what Mr. Pattis is suggesting now would be

15    and, therefore, it would be inappropriate to remain at

16    liberty until the end of the appeals process.

17    THE COURT:  Yeah --

18    MR. PATTIS:  On its face, Judge, the Government is

19    correct.  It falls within the parameters of the numbers we

20    discussed.  But because of the First Amendment issues in

21    this case, the Government's use of them, the Court's

22    reference on two occasions in its imposition of sentence --

23    THE COURT:  What --

24    MR. PATTIS:  -- to speech acts --

25    THE COURT:  Okay.

 1              MR. PATTIS:  -- we do intend to --

 2              THE COURT:  What --

 3              MR. PATTIS:  -- take an appeal.

 4              THE COURT:  What exactly, Mr. Pattis, are you

 5    talking about in terms of my reference to speech acts?  Just

 6    so I understand --

 7              MR. PATTIS:  Not merely --

 8              THE COURT:  -- and so the record's clear.

 9              MR. PATTIS:  -- a trespasser.  He played a role in

10    amping up --

11              THE COURT REPORTER:  I'm sorry.  What?  I can't

12    hear you.

13              MR. PATTIS:  He was not merely a trespasser.  He

14    played a role in amping up the crowd.  And then the

15    reference to his conduct on the whole, given the entire

16    record and his statements.  So I think on -- it would be our

17    intention to draw attention to that and to perfect the issue

18    that, frankly, I'd raised in the Proud Boys case on a better

19    playing field for the defense in this case.

20              THE COURT:  So --

21              MS. PASCHALL:  (Indicating.)

22              THE COURT:  Go ahead.

23              MS. PASCHALL:  And in the Proud Boys case, they

24    chose to go to trial and not waive any of those appellate

25    rights.  So that is an appropriate forum for that.  I do not

1     think that's an appropriate forum here.  But, again, I don't

2     have the language of the agreement particularly in front of

3     me, and Your Honor is allowed to consider those things under

4     3553(a).  So regardless of whether or not he chooses to file

5     the appeal -- which, you know, he can make that

6     determination -- the Government's position with respect to

7     release until the perfection of that appeal would be that we

8     oppose.

9               THE COURT:  Okay.  So there is a body of law -- I

10    know enough to know this.  There is a body of law that

11    exists that is -- that sets out a standard under which a

12    court can consider this kind of arrangement.  In other

13    words, keeping someone at liberty while an appeal is

14    pending.  I don't have that standard in front of me.  So I'm

15    not going to order that right now.  But, Mr. Pattis, if you

16    file a motion, I'll consider your motion.  I don't want to

17    make any more work for you.  My inclination is that there --

18    the standard is something about, you know, whether there's

19    an -- arguably -- I don't know -- a -- it -- there is a

20    standard for when courts can consider that, and I think

21    it --

22              MR. PATTIS:  I think the standard runs something

23    like it has to be more than a non-frivolous basis for the

24    appeal.

25              THE COURT:  Right.

1          MR. PATTIS:  And we think we've met that, but I'll

2     brief that.

3          THE COURT:  Right.  I don't know that you have,

4     but I -- if you file a motion, I'll consider it.

5          MR. PATTIS:  Thank you, sir.

6          THE COURT:  Okay.  All right.  This concludes

7     my --

8          THE DEPUTY CLERK:  Judge ---

9          THE COURT:  -- judgment in this case.

10         THE DEPUTY CLERK:  Judge, (indicating.)

11         THE COURT:  Oh, all right.  For -- all right.

12     Yes, I'll hear from you, ma'am.

13         THE PROBATION OFFICER:  Thank you, Your Honor.

14         After the completion of the defendant's custodial

15     sentence, would the Court be inclined to allow supervision

16     to be transferred to the Western District of Texas?

17         THE COURT:  I will allow transfer of supervision

18     but not jurisdiction.

19         THE PROBATION OFFICER:  Thank you, Your Honor.

20         THE COURT:  All right.

21         MS. PASCHALL:  And, Your Honor, at this time, the

22     Government would move to dismiss the remaining counts that

23     are in the information, Counts 2, 3, and 4.  Also, pursuant

24     to the plea agreement, the Government does intend to dismiss

25     the pending matter in D.C. Superior Court.  It may take a

1    couple of days for my colleagues in that courthouse to

2    effect that, but that is the Government's intention.

3              THE COURT:  Okay.  That motion, obviously, with

4    regard to the other counts against Mr. Shroyer is granted.

5              Hold on one second.

6              (Brief pause.)

7              All right.  I want to just go ahead and make sure.

8    The -- with regard to the special assessment, the -- I don't

9    have the statute in front of me, but the special

10   assessment -- is it $25 or $20?  I may have said 25, because

11   I think 25 --

12             THE DEPUTY CLERK:  It's 20 and it says 25.

13             THE PROBATION OFFICER:  It should be 25 per

14   statute, Your Honor.

15             THE COURT:  25 per statute.

16             THE DEPUTY CLERK:  Mm-hmm.

17             THE COURT:  Okay.  So it is -- and what I did say,

18   Ms. Harris?

19             THE DEPUTY CLERK:  20.

20             THE COURT:  20?  Okay.  It's 25.  25 is the

21   special assessment, to make that crystal clear.

22             MR. PATTIS:  May I have one moment, Judge?

23             THE COURT:  Yes.

24             (Brief pause.)

25             THE PROBATION OFFICER:  And, Your Honor, for

1    clarification, did the Court make a finding that the

2    defendant is unable to make a -- pay a fine in this case?

3            THE COURT:  Well, I should have said that, and if

4    I didn't, yes, I am making that finding --

5            THE PROBATION OFFICER:  Thank you, Your Honor.

6            THE COURT:  -- that he does not have the ability

7    to pay a fine and so, thus, I am not imposing a fine.

8            Thank you.

9            Anything further from the Government?

10           MS. PASCHALL:  No, Your Honor.  Thank you.

11           THE DEPUTY CLERK:  I assume you're going to let

12   him self-report.

13           THE COURT:  Yes.  Yes.  Yes.  Obviously,

14   Mr. Shroyer -- yes, Mr. Shroyer will not -- to the extent I

15   needed to clarify that, Mr. Shroyer will not be detained

16   today.  Correct.

17           Anything from you, Mr. Pattis?

18           MR. PATTIS:  Do we need to report to the marshals

19   office or are we at liberty to leave?

20           THE COURT:  No, I don't believe so, but why don't

21   I have -- you -- he'll get instruction on when to report --

22   when and where, but I don't think you have to report to the

23   marshals office today.

24           MR. PATTIS:  Thank you, sir.

25           THE COURT:  All right.

```
1            THE DEPUTY CLERK:  One more thing.

2            THE COURT:  All right.

3            THE DEPUTY CLERK:  I have to put it in the

4     judgment.  Will he be reporting at the direction of --

5            THE COURT:  He --

6            THE DEPUTY CLERK:  -- Probation or at the

7     direction of --

8            THE COURT:  He -- all right.  He'll report at the

9     direction of the Bureau of Prisons.

10            THE DEPUTY CLERK:  Of the Bureau of Prisons?

11     Thank you.

12            THE COURT:  Correct, unless -- and then

13     that's unless and until that is changed by some motion that

14     Mr. Pattis might file.  All right.

15            (Brief pause.)

16            Anything further, Mr. Pattis?

17            MR. PATTIS:  No, sir.

18            THE COURT:  All right.  Very well.  Until then,

19     the parties are dismissed.

20            THE DEPUTY CLERK:  All rise.  This Honorable Court

21     stands in recess.

22            (Proceedings concluded at 11:32 a.m.)

23                 * * * * * * * * * * *

24            CERTIFICATE OF OFFICIAL COURT REPORTER

25     I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that
```

55

1    the above and foregoing constitutes a true and accurate

2    transcript of my stenographic notes and is a full, true and

3    complete transcript of the proceedings to the best of my

4    ability, dated this 3rd day of October 2023.

5                           /s/Timothy R. Miller, RPR, CRR, NJ-CCR

6                            Official Court Reporter
                               United States Courthouse
                               Room 6722

7                            333 Constitution Avenue, NW
                               Washington, DC 20001

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25